2002 ND 125

**Ronald J. SJOSTRAND, Claimant and Appellant,**

v.

**NORTH DAKOTA WORKERS COMPENSATION BUREAU,**
Appellee.

and

**University Of North Dakota,**
**Respondent.**

No. 20010271.

Supreme Court of North Dakota.

Aug. 15, 2002.

Rehearing Denied Oct. 15, 2002.

Mark G. Schneider, Schneider, Schneider & Phillips, Fargo, for claimant and appellant.

Leo F.J. Wilking, Special Assistant Attorney General, Fargo, for appellee.

VANDE WALLE, Chief Justice.

[¶ 1] Ronald J. Sjostrand appealed a judgment affirming a North Dakota Workers Compensation Bureau order adopting an administrative law judge's recommendation that Sjostrand forfeit all additional benefits for misrepresenting his physical condition and abilities. We affirm.

### I

[¶ 2]   While employed by the University of North Dakota as a landscaper, Sjostrand was injured in an automobile accident in 1995.  Sjostrand filed a claim for workers compensation benefits.  The Bureau accepted the claim and paid benefits. Sjostrand was terminated from his position in January 1997.  Sjostrand began a retraining program in September 1997 to become a health information technician. Sjostrand developed fibromyalgia as a result of his injury and began consulting Dr. Yue for treatment in January 1998.  Upon his request and the approval of Dr. Yue, Sjostrand reduced his classload in August 1998.   Sjostrand discontinued his educational program in October 1998.  After receiving an anonymous tip about Sjostrand's physical activities in April 1999, the Bureau began an investigation, which included videotaped surveillance.  Sjostrand completed an independent medical examination at the Bureau's direction in September 1999.

[¶ 3]   The Bureau issued a notice of intention to discontinue further benefits ("Notice") dated November 22, 1999, advising Sjostrand it had determined he violated N.D.C.C. § 65–05–33 with a false claim or a false statement, and all further benefits would be forfeited after September 13, 1999.   The Notice contained a five-page summary of the evidence the Bureau was relying upon, including: (1) The Bureau received an anonymous report that Sjostrand had been engaging in physical activities beyond what his treating physician has reported him capable of doing; (2) Sjostrand's employment with the University of North Dakota was terminated for an inability to perform the essential functions of the position; (3) "During surveillance from May 11, 1999, through May 25, 1999, from July 14, 1999 through July 17, 1999, and September 12, 1999, through September 25, 1999, you were observed … performing very rigorous physical activities, which required physical abilities beyond what Dr. Yue has stated you are capable of performing;" (4) a description of activities recorded in the videotaped surveillance;  and (5) the following additional evidence:

On September 13, 1999, per the Bureau's request, Dr. Gregory Peterson completed an Independent Medical Evaluation (IME).   Dr. Peterson documented your current symptoms as follows:  Mr. Sjostrand reports that his pain problems are very "mutable."   "Today my wrists, my arms, and my feet bother me."   He notes that his upper back is "generally worse."   Other times he has pain, "absolutely from the tips of my toes on up."   Mr. Sjostrand reports that all activities aggravate his pain. Other than medications, the only alleviating activity is "my recliner is as good as it gets."   On the pain drawing, there are listed different qualities of discomfort, including "pins and needles, stabbing, burning and deep ache."   Mr. Sjostrand has arrows pointing to all four of these qualities and indicates, "all over."

Upon review of your medical records and completion of his examination, Dr. Peterson concluded the following: "Mr. Sjostrand has generalized, variable, nonspecific pain complaints which are markedly out of proportion to objective findings.   Findings on examination suggest a conscious or unconscious exaggeration of pain behaviors."

. . . .

On October 21, 1999 … Dr. Peterson reviewed the surveillance videos of you from May 1999, July 1999, and September 1999.

By letter dated October 22, 1999, Dr. Peterson made the following comment regarding his review of the surveillance

videos. "On the surveillance videos, I observed Mr. Sjostrand demonstrating excellent neck range of motion without apparent pain. He had full functional use of his arms, performing very rigorous physical activities. The capabilities demonstrated on the surveillance videos clearly demonstrate that he misrepresented his abilities during my interview with him. The findings on the videotape also clearly demonstrate that Mr. Sjostrand willfully attempted to deceive me regarding his physical capabilities on physical examination. Based on my review of Mr. Sjostrand's surveillance video, I believe that he is capable of performing all duties required of a landscaper (his previous occupation)."

The Bureau sent Sjostrand an amended Notice, dated November 24, 1999, advising him his "disability benefits will be terminated due to the reasons outlined in the 11–22–99 notice effective 12–15–99." By letter of December 17, 1999, Sjostrand's attorney asserted "the Bureau's decision is 'wrong'" and requested "a copy of Mr. Sjostrand's *entire* file at the Bureau."

[¶ 4] On February 2, 2000, the Bureau concluded Sjostrand made false statements and ordered forfeiture of all additional benefits and reimbursement for any benefits paid based upon the false statement. On February 21, 2000, Sjostrand requested a rehearing, demanded the immediate appointment of an administrative law judge ("ALJ"), and demanded the Bureau conduct no further investigation or discovery.

[¶ 5] An administrative hearing was held on June 23 and July 14, 2000. On November 22, 2000, the ALJ issued recommended findings of fact, conclusions of law, and the following forfeiture order, in part:

Ordered, that pursuant to N.D.C.C. § 65–05–33, Ronald Sjostrand shall forfeit any and all additional benefits in connection with his claim for workers compensation benefits, including disability benefits, medical expenses, vocational rehabilitation benefits, and permanent partial impairment benefits; and it is further

Ordered, that upon these proceedings the North Dakota Workers Compensation Bureau shall not have reimbursement of any workers compensation benefits paid to Ronald Sjostrand.

On December 27, 2000, the Bureau adopted the ALJ's recommendation.

[¶ 6] Sjostrand appealed to the district court, which affirmed the Bureau's decision. Sjostrand, in his appeal to this Court, contends: (1) termination of his benefits without an opportunity for an evidentiary hearing deprived him of due process of law; (2) the Bureau failed to show he has either willfully or materially violated N.D.C.C. § 65–05–33; (3) the Bureau erred in relying on a "preponderance of the evidence" standard, rather than a "clear and convincing evidence" standard of proof; and (4) the delays and continuing investigations by the Bureau after issuing the Notice of November 24, 1999, constitute impermissible adversarial conduct and endemic institutional delay requiring reinstatement of all future benefits and reimbursement of his costs and attorney fees.

II

[¶ 7] We recently again outlined the scope of review of the Bureau's decisions under N.D.C.C. §§ 28–32–19 and 28–32–21 [1]:

---

1. Sjostrand appealed the Bureau's decision to the district court on January 26, 2001. Effective August 1, 2001, the scope of judicial review of administrative agency decisions is governed by N.D.C.C. §§ 28–32–46 and 28–32–49.

On appeal, we review the decision of the administrative agency, rather than that of the district court, although the district court's analysis is entitled to respect. *Snyder v. North Dakota Workers Comp. Bureau*, 2001 ND 38, ¶ 7, 622 N.W.2d 712. Under N.D.C.C. §§ 28–32–19 and 28–32–21, which, effective August 1, 2001, are codified at 28–32–46 and 28–32–49, we affirm the Bureau's decision unless its findings of fact are not supported by a preponderance of the evidence, its conclusions of law are not supported by its findings of fact, its decision is not supported by its conclusions of law, its decision is not in accordance with the law or violates the claimant's constitutional rights, or its rules or procedure deprived the claimant of a fair hearing. *Negaard–Cooley v. North Dakota Workers Comp. Bureau*, 2000 ND 122, ¶ 7, 611 N.W.2d 898. We exercise restraint in deciding whether the Bureau's findings of fact are supported by a preponderance of the evidence, and we do not make independent findings or substitute our judgment for that of the Bureau; rather, we decide whether a reasoning mind reasonably could have decided the Bureau's findings were proven by the weight of the evidence from the entire record. *Renault v. North Dakota Workers Comp. Bureau*, 1999 ND 187, ¶ 16, 601 N.W.2d 580. Questions of law, including the interpretation of a statute, are fully reviewable on appeal from a Bureau decision. *Lawrence v. North Dakota Workers Comp. Bureau*, 2000 ND 60, ¶ 11, 608 N.W.2d 254.

*Paul v. North Dakota Workers Comp. Bureau*, 2002 ND 96, ¶ 6, 644 N.W.2d 884.

### III

■ [¶ 8] Sjostrand contends the Bureau's termination of his disability benefits without first providing an opportunity for an evidentiary hearing violated his right to due process of law.

■ [¶ 9] "[U]nder our state statutes, the continuing right to disability benefits under the Worker's Compensation Act is a 'property' right protected by the Due Process Clause." *Beckler v. North Dakota Workers Comp. Bureau*, 418 N.W.2d 770, 772 (N.D.1988). This Court recognized the importance of disability benefits to a recipient: "Continuation of disability benefits is significant to those who are entitled to them. By definition, disability benefits are paid while the claimant is unable to work." *Id.* at 774. However, this Court said:

> In contrast, eligibility for disability benefits depended on a medically determinable impairment, a subject more sharply focused and more easily documented than the typical entitlement to welfare. Thus, the potential value of an oral presentation or evidentiary hearing before deprivation of disability benefits was substantially less than in the case of welfare benefits.

*Id.* at 773. This Court held a recipient of disability benefits must be given an opportunity to respond to termination of benefits before termination, but need not be given a prior evidentiary hearing if there is a timely post-termination hearing:

> While Beckler must be accorded an opportunity to respond to the termination of disability benefits, we do not expect a pretermination evidentiary hearing with an occasion to confront witnesses. In our view an evidentiary hearing before termination would unduly burden the governmental interest because medical records will usually resolve whether the claimant can work. Rather, we believe that opportunity to respond should be limited to a written submission as an initial check against an

erroneous decision. *See Cleveland Board of Education v. Loudermill[*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)], *supra; Goss v. Lopez*[, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)], *supra; Mathews [v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)], *supra.* In this respect our holding rests in part on the Bureau conducting a timely post-termination evidentiary hearing and on the Bureau's authority to award retroactive disability benefits.

*Beckler,* at 775.

[¶ 10]   Sjostrand asserts "there simply is no constitutionally permissible way to allow the Bureau to terminate disability benefits *unless* it *first* provides an evidentiary hearing," arguing "recognizing the burden of proving 'fraud' is clearly upon the Bureau and that such proof can be rarely 'proven directly' but 'usually must be inferred from conduct and circumstantial evidence,' due process mandates a formal evidentiary hearing prior to termination of benefits." This Court, however, has allowed the Bureau to terminate disability benefits without a prior evidentiary hearing for false statements under N.D.C.C. § 65–05–33. *See Jacobson v. North Dakota Workers Comp. Bureau,* 2000 ND 225, 621 N.W.2d 141; *Stewart v. North Dakota Workers Comp. Bureau,* 1999 ND 174, 599 N.W.2d 280. In *Stewart,* the majority opinion outlined the due process elements required for terminating disability benefits without a prior evidentiary hearing:

> [W]orkers compensation disability benefits could be discontinued without a pretermination hearing only when there were "elaborate" pretermination procedural safeguards and a right to a timely post-termination evidentiary hearing. *Beckler,* at 773–75. The pretermination procedure must include, at a minimum, pretermination notice of the contemplat-

ed action, a summary of the evidence supporting the proposed termination, and a pretermination opportunity to respond in writing to the alleged grounds for termination. *Id.* We have consistently reiterated that due process requires these pretermination protections, including a summary of the evidence. *Stewart,* 1999 ND 174, ¶ 12, 599 N.W.2d 280.

[¶ 11]   We are not persuaded we should overrule, and we therefore adhere to, our decisions holding disability benefits may be terminated under N.D.C.C. § 65–05–33 without a prior evidentiary hearing if the due process elements specified in *Stewart* are provided. We conclude the Bureau's termination of Sjostrand's disability benefits under N.D.C.C. § 65–05–33 without first providing an opportunity for an evidentiary hearing did not violate his right to due process of law.

### IV

[¶ 12]   Sjostrand contends the Bureau failed to show he willfully or materially violated N.D.C.C. § 65–05–33, arguing (1) "The Bureau has *not* found that Sjostrand made any 'false statements' but, rather, that he 'consciously exaggerated his pain behaviors;'" and (2) "Surveillance videotapes should have been excluded from the evidence or, if included, given little weight."

### A

[¶ 13]   Section 65–05–33, N.D.C.C., provides, in part:

1. A person who claims benefits or payment for services under this title . . . is guilty of a class A misdemeanor if the person . . . does any one or more of the following:

a. Willfully files a false claim or makes a false statement in an attempt to

secure payment of benefits or payment for services.

b. Willfully misrepresents that person's physical condition, including deceptive conduct which misrepresents that person's physical ability.

The statute provides for reimbursement of benefits paid and forfeiture of additional benefits for violation of the statute. What is now codified as N.D.C.C. § 65–05–33(1)(b) was adopted in 1997, effective August 1, 1997. 1997 N.D. Sess. Laws ch. 534, § 4.[2]

[¶ 14]   After citing *Wanstrom v. North Dakota Workers Comp. Bureau,* 2000 ND 17, ¶ 7, 604 N.W.2d 860, where we reiterated that, unless otherwise provided, statutes in effect at the time of an injury govern workers compensation benefits, Sjostrand contends in his brief:

If the 1997 version of § 65–05–33 does not apply to Sjostrand—as he asserts—then the Bureau's entire case disappears because he has undisputedly made no "false statement" and his "nonverbal conduct" simply is not an element of the statute in effect on his date of injury.

Section 65–05–33 was amended and reenacted in 2001 to provide that it applies to all claims, regardless of the date of injury. 2001 N.D. Sess. Laws ch. 576, §§ 2, 3. "However, statutory enactments may not operate retrospectively to abrogate a vested right or a valid contractual obligation. A vested right is an immediate or fixed right to present or future enjoyment that does not depend upon an event that is uncertain." *Saari v. North Dakota Workers Comp. Bureau,* 1999 ND 144, ¶ 10, 598 N.W.2d 174 (citations omitted).

[¶ 15]   Under N.D.C.C. § 65–05–04, the Bureau may review a compensation award and end, diminish or increase it. That section "is a legislative recognition that a benefit recipient's status may change over time" and "the Bureau may appropriately investigate whether a recipient continues to be disabled." *Snyder v. North Dakota Workers Comp. Bureau,* 2001 ND 38, ¶ 9, 622 N.W.2d 712. A determination of whether or not a recipient remains disabled and entitled to benefits may be made any time. Sjostrand has not shown he has a vested right to benefits under the law in effect at the time of his injury, as he has not shown "an immediate or fixed right to present or future enjoyment that does not depend upon an event that is uncertain." *Saari,* at ¶ 10. *See also Gregory v. North Dakota Workmen's Comp. Bureau,* 369 N.W.2d 119, 121 (N.D.1985) (amount of compensation is determined under the rate in effect as of date of impairment determination, not that in effect at the time of injury). A determination of continuing disability should be based on the law in effect when that determination is made, not that in effect at the time of the injury. Sjostrand has not shown he has a fixed right to continue receiving benefits based upon a 1999 willful misrepresentation of his physical condition or his physical ability that would preclude application to him of the misrepresentation provisions of N.D.C.C. § 65–05–33 enacted in 1997. We conclude the 1997 version of N.D.C.C. § 65–05–33(1)(b), dealing with misrepresentation of physical condition applies to Sjostrand's claim.

[¶ 16]   The Bureau found:

9.   The surveillance of Sjostrand's activities was conducted over a period of nearly five months beginning May 4, 1999, through September 25, 1999. In

---

**2.** In *Zueger v. North Dakota Workers Comp. Bureau,* 1998 ND 175, ¶ 14, 584 N.W.2d 530, a majority of this Court held nonverbal conduct on a functional capacity evaluation "was not a 'statement' under N.D.C.C. § 65–05–33(1)" prior to its amendment in 1997.

connection with that surveillance more than six hours of videotape were made showing Sjostrand's various activities, including mowing lawn on May 13, 1999; working on the deck of his home on May 18, 1999, doing still photography on July 14, 1999; and working in connection with a rummage sale on July 16 and 17, 1999. While his activities are not without pain and some limitation as a result, he is clearly able to work effectively and efficiently to mow lawn, maintain and improve the deck of his home, engage in photography, and conduct a rummage sale.

10. The greater weight of the evidence establishes that Sjostrand's activities shown on the videotapes made in the course of the surveillance of Sjostrand conducted by the Bureau are fairly representative of his physical condition and physical abilities in usual and typical circumstances, notwithstanding that he may on occasion "pay for" his activities by a period of increased pain and disability following his activities, that he has "good days" when he can do more and "bad days" when he is not able to do as much, and that he can do more when the analgesic medicine he uses is most effective.

11. The Bureau ordered Sjostrand to attend an independent medical exam by Dr. Gregory Peterson on September 13, 1999. Upon the completion of his examination, Dr. Peterson concluded and reported to the Bureau that "Mr. Sjostrand has generalized, variable, nonspecific pain complaints which are markedly out of proportion to objective findings," and that "findings on examination suggest a conscious or unconscious exaggeration of pain behaviors." R., Ex. 39, p. 433. After viewing portions of the videotapes of Sjostrand's activities during the surveillance conducted by the Bureau's investigator, Dr.

Peterson concluded that Sjostrand's exaggeration of pain behaviors during his examination was conscious; that during his examination [ ] Sjostrand had willfully misrepresented his physical abilities; specifically, that he "willfully misrepresented his degree of disability." R., Tr., June 23, 2000, p. 375.

12. Based upon his viewing all of the videotapes showing Sjostrand's activities during the periods of his surveillance by the Bureau, it is Dr. Peterson's opinion that Sjostrand would be able to do the same activities which he did during the periods of videotaped surveillance during the majority of other days when the surveillance was conducted.

13. Had Sjostrand's misrepresentation of his physical condition and physical abilities to Dr. Peterson gone unchecked, it is likely that he would have continued to receive disability benefits upon the opinion of Dr. Yue that he was totally disabled, and would not have resumed his rehabilitation program.

The Bureau concluded:

8. While there is insufficient evidence of any intentional false statement by Sjostrand to Dr. Peterson for the independent medical examination which he conducted . . . the greater weight of evidence establishes that Sjostrand consciously exaggerated his pain behaviors upon his examination by Dr. Peterson, and in so doing willfully misrepresented his physical condition and physical abilities (that is, [ ] he acted intentionally with the purpose to deceive Dr. Peterson concerning his physical condition and his physical abilities).

9. Had Sjostrand's willful misrepresentation of his physical condition and physical abilities to Dr. Peterson gone unchecked, it is likely that he would have continued to receive disability ben-

efits upon the opinion of Dr. Yue that he was totally disabled and would not have resumed his rehabilitation program, and, therefore, his misrepresentation was material to the determination of his entitlement to workers compensation benefits.

We conclude from our review of the record there is evidence from which a reasoning mind reasonably could have determined the findings were proven by the weight of the evidence. We further conclude the Bureau properly applied the misrepresentation provisions of N.D.C.C. § 65–05–33 to Sjostrand's claim and properly concluded Sjostrand's misrepresentations violated N.D.C.C. § 65–05–33.

### B

[¶ 17] Sjostrand contends the "[s]urveillance videotapes should have been excluded from the evidence or, if included, given little weight."

■ [¶ 18] Sjostrand argues his activities shown in the videotapes—mowing his lawn, doing light work on the deck of his home, taking photographs, and participating in a rummage sale—do not constitute "work activities" required to be reported by N.D.C.C. § 65–05–08(3) and are "as a matter of law, not 'material' for the purpose of the fraud statute." Section 65–05–08(3), N.D.C.C., provides, in part: "For purposes of this subsection, 'work' does not include routine daily activities of self-care or family care, or routine maintenance of the home and yard." While the activities Sjostrand is shown performing in the surveillance videotapes may not be "work" or "work activities" under N.D.C.C. § 65–05–08(3), they are evidence of Sjostrand's physical condition and ability. Thus, we are unable to conclude the activities shown are not material as a matter of law.

■ [¶ 19] Sjostrand argues:

Moreover, the videotapes, on their face, are inherently unreliable as an indicator of Sjostrand's true abilities over time. First, the 7½ *hours* of videotape (AR 663a) cover a time frame of 4½ *months*. The 7½ hours were subjectively selected by the persons doing the videotapes with absolutely no attempt to record, in any manner, the activities of Sjostrand in the weeks and months that are *not* covered by the 7½ hours of videotape. Furthermore, the videotapes themselves are "on again-off again" tapes which do not, in any manner, show what Sjostrand was doing (for example, taking rest breaks) between the subjectively excerpted portions taken by the investigators.

Relying on 28 Am.Jur.2d, *Evidence* § 985, *John B. Kelly Co. v. Workmen's Comp. Appeal Bd.*, 8 Pa.Cmwlth. 589, 303 A.2d 255 (1973); *DeBattiste v. Anthony Laudadio & Son*, 167 Pa.Super. 38, 74 A.2d 784 (1950); *Lambert v. Wolf's, Inc.*, 132 So.2d 522 (La.Ct.App.1961); and 7 *Larson's Workers' Compensation Law*, § 127.10 (2000), Sjostrand argues edited videotapes are inherently suspect, should be viewed with caution, and are of questionable value. Sjostrand also contends: "Finally—and overtly compounding the entire matter— the 7½ hours of videotape were distilled into a *27 minute* videotape by the Bureau and shown to the ALJ at the hearing and was the basis for Dr. Peterson's testimony." As to this point, however, the ALJ stated in his recommended findings, conclusions, and order, that his "conclusions are based upon all of the videotapes." Dr. Peterson testified he reviewed all the videotapes "in their entirety;" and testified the edited videotape "is a fair representation of the activities I observed on the complete set of videotapes."

■ [¶ 20] Furthermore, Sjostrand's arguments about the videotapes go to their

weight. Sjostrand was free to, and did, present argument and evidence designed to undercut the weight to be given to the videotapes. "The Bureau has discretion to weigh the evidence before it, although it may not pick and choose in an unreasonable manner." *Buchmann v. North Dakota Workers Comp. Bureau*, 2000 ND 79, ¶ 25, 609 N.W.2d 437. We conclude the videotapes were appropriately received into evidence and the weight to be given them was for the Bureau to determine.

### V

[¶ 21] Sjostrand contends the Bureau erred in using a "preponderance of the evidence" standard of proof in applying N.D.C.C. § 65–05–33, rather than a "clear and convincing evidence" standard.

### A

[¶ 22] Sjostrand argues: "This Court has *never* specifically addressed whether the Bureau's burden under the 'fraud' statute must be by 'clear and convincing evidence.'"

[¶ 23] In *F.O.E. Aerie 2337 v. North Dakota Workers Comp. Bureau*, 464 N.W.2d 197, 198–99 (N.D.1990), the Bureau found an injured employee had made a false statement about his prior medical history, concluded that, under N.D.C.C. § 65–05–33, the claimant must forfeit additional benefits otherwise due him, and ordered forfeiture of future benefits. This Court affirmed, noting one of the critical questions was whether the findings were supported by a preponderance of the evidence, and concluding: "The Bureau's findings of fact are ... supported by a preponderance of the evidence." *F.O.E. Aerie 2337*, at 199. In *Hausauer v. North Dakota Workers Comp. Bureau*, 1997 ND 243, ¶ 13, 572 N.W.2d 426, this Court followed *F.O.E. Aerie 2337* and held: "In order to trigger the civil penalties, the Bureau must prove the elements of N.D.C.C. § 65–05–33 by a preponderance of the evidence." Since those decisions, a number of claimants have asserted the Bureau's burden of proof in applying N.D.C.C. § 65–05–33 is clear and convincing evidence, rather than a preponderance of the evidence. *See Snyder v. North Dakota Workers Comp. Bureau*, 2001 ND 38, ¶ 19, 622 N.W.2d 712; *Aalund v. North Dakota Workers Comp. Bureau*, 2001 ND 32, ¶ 9, 622 N.W.2d 210; *Renault v. North Dakota Workers Comp. Bureau*, 1999 ND 187, ¶ 11, 601 N.W.2d 580; *Hopfauf v. North Dakota Workers Comp. Bureau*, 1998 ND 40, ¶ 15, 575 N.W.2d 436, in which this Court declined to address the issue because the claimants had inadequately raised or otherwise failed to preserve the issue for appellate review. Thus, although some claimants have attempted to secure a reassessment of the burden of proof under N.D.C.C. § 65–05–33 since *F.O.E. Aerie 2337* and *Hausauer*, this Court has not undertaken such a reassessment.

[¶ 24] Sjostrand asserts this Court has "broadly hinted that it would entertain an appropriate argument for application of 'clear and convincing evidence' standard under N.D.C.C. § 65–05–33 'fraud' cases," citing the following language in *Renault v. North Dakota Workers Comp. Bureau*, 1999 ND 187, ¶ 12 n. 4, 601 N.W.2d 580:

> We have recognized, however, "an evidentiary standard of proof differs from a standard of review employed by an appellate court to a decision in which the standard of proof has already been applied." *In re Dvorak*, 1998 ND 134, ¶ 16, 580 N.W.2d 586.

However, N.D.C.C. §§ 28–32–46 and 28–32–49 since August 1, 2001, and N.D.C.C. §§ 28–32–19 and 28–32–26 before that, provide both a standard of review and an evidentiary standard of proof by requiring

judicial affirmance of administrative agency orders unless the agency's findings of fact "are not supported by a preponderance of the evidence."

### B

[¶ 25] Sjostrand contends: "Because it was for the injured worker that the Act was passed, and in order to preserve the constitutionality of the statute, the Bureau must prove its allegations of 'fraud' by 'clear and convincing evidence.'" Sjostrand argues that because fraud must be proven by clear and convincing evidence in a civil action, *see Fargo Foods, Inc. v. Bernabucci*, 1999 ND 120, ¶ 19, 596 N.W.2d 38, it "follows—*a fortiori*—that the Bureau ... *must* have no less burden" or "the profound constitutional issue as to whether the injured worker is still getting the 'benefit of the bargain imposed' on the injured worker must be confronted" and "interpreting the statute to require the 'clear and convincing' standard *avoids* the profound constitutional issue as to whether any less a burden on the Bureau would unconstitutionally undermine the 'sure and certain' relief provided to the injured worker in return for depriving him of his 'important substantive right' of access to courts."

[¶ 26] When we trace the origins of the "clear and convincing evidence" standard to prove fraud to its earliest origin in the opinions of this Court, it is apparent the standard evolved out of "the general rule ... that fraud is never presumed but must be affirmatively proved." *Krause v. Krause*, 151 N.W. 991, 994, 30 N.D. 54 (1915). But even there the court further stated "the presumption, if any, is in favor of innocence and the burden falls on him who asserts fraud to establish it by proving every material element constituting such fraud *by a preponderance of the evidence*." *Id.* (Emphasis added). In any event, it is apparent the subsequent cases

through which the "clear and convincing evidence" standard has evolved did not involve a standard specified by the Legislature. *See, e.g., Verry v. Murphy*, 163 N.W.2d 721 (N.D.1968).

[¶ 27] We have said that, under N.D.C.C. § 28–32–19 the usual standard of review for administrative agency findings of fact is a preponderance of the evidence. *Hanson v. Industrial Comm'n*, 466 N.W.2d 587, 590 (N.D.1991). The usual standard of review applied by courts in reviewing factual determinations of administrative agencies formerly provided by N.D.C.C. §§ 28–32–19 and 28–32–21, and which now, effective August 1, 2001, is provided by N.D.C.C. §§ 28–32–46 and 28–32–49, is the preponderance of the evidence standard. However, when a specific statutory standard of review differs from the general standard, the specific statute ordinarily prevails under N.D.C.C. § 1–02–07. *Amoco Production Co. v. Industrial Comm'n*, 307 N.W.2d 839, 841–42 (N.D. 1981).

[¶ 28] Under N.D.C.C. § 65–01–11, a claimant generally "has the burden of proving by a preponderance of the evidence that the claimant is entitled to benefits." The legislature has imposed a clear and convincing evidentiary standard, a specific standard differing from the general standard, in a number of workers compensation statutes. *See* N.D.C.C. § 65–05–15(1) (period of acute care for some compensable injuries "is presumed to be sixty days ... absent clear and convincing evidence to the contrary"); N.D.C.C. § 65–05–15(3) (aggravation benefits are presumed payable on a fifty percent basis unless the presumption is rebutted with "clear and convincing evidence to the contrary"); and N.D.C.C. § 65–05–35(2) (a claim presumed closed may not be reopened "unless the presumption is rebut-

ted by clear and convincing evidence that the work injury is the sole cause of the current symptoms").

[¶ 29] Section 65–05–33, N.D.C.C., does not specify an evidentiary burden of proof. If a statute specifies no burden of proof, arguably this Court could supply one. *See Steadman v. S.E.C.*, 450 U.S. 91, 95–6, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) ("Where Congress has not prescribed the degree of proof which must be adduced ... in an administrative proceeding, this Court has felt at liberty to prescribe the standard."). However, the *Steadman* court continued, "where Congress has spoken, we have deferred to 'the traditional powers of Congress to prescribe rules of evidence and standards of proof in the federal courts' absent countervailing constitutional constraints." *Id.* (citations omitted). Here, the legislature has spoken, and Sjostrand's argument has not persuaded us there are countervailing constitutional constraints.

[¶ 30] Because N.D.C.C. § 65–05–33. does not specify an evidentiary burden of proof, it does not provide a specific standard differing from the general standard of a preponderance of the evidence specified for judicial review of an administrative agency's findings of fact in N.D.C.C. ch. 28–32. Thus, we conclude the Bureau's findings under N.D.C.C. § 65–05–33 must be affirmed if they are supported by a preponderance of the evidence.

## VI

[¶ 31] Sjostrand contends Bureau delays and continuing investigations after the November 24, 1999, Notice constitute impermissible adversarial conduct and endemic institutional delay mandating a finding of contempt or other remedies.

### A

[¶ 32] Citing *Blanchard v. North Dakota Workers Comp. Bureau*, 1997 ND 118, ¶ 23, 565 N.W.2d 485 and *Hayes v. North Dakota Workers Comp. Bureau*, 425 N.W.2d 356, 357 (N.D.1988), Sjostrand says "[t]his Court has 'repeatedly cautioned' that the Bureau must not take a 'position ... fully adversary to the claimant ...;'" notes this Court has said "[t]he adversary concept has only limited application to claims for workmen's compensation benefits and the Bureau ... acts in a quasi-judicial capacity" (citing *Roberts v. North Dakota Workmen's Comp. Bureau*, 326 N.W.2d 702, 706 (N.D.1982), *Bromley v. North Dakota Workmen's Comp. Bureau*, 304 N.W.2d 412, 416 (N.D.1981), *Steele v. North Dakota Workmen's Comp. Bureau*, 273 N.W.2d 692, 702 (N.D.1978)), and further notes "this Court long ago pointedly informed the Bureau that its admonishments to the Bureau must not be 'treated as empty noise'" (citing *Spangler v. North Dakota Workers Comp. Bureau*, 519 N.W.2d 576, 578 (N.D.1994)). That is the extent of Sjostrand's argument about impermissible adversarial conduct by the Bureau. "With no more development than that, the issue would ordinarily be deemed abandoned." *Olander Contracting Co. v. Gail Wachter Invs.*, 2002 ND 65, ¶ 32, 643 N.W.2d 29. "We have also said a party waives an issue by not providing supporting argument." *Id.* at ¶ 27. Nevertheless, we have examined the record in light of Sjostrand's argument, and we conclude Sjostrand has not shown the Bureau engaged in impermissible adversarial conduct.

### B

[¶ 33] Sjostrand contends the Bureau has engaged in endemic institutional delay requiring a finding of contempt or the fashioning of other remedies. Sjostrand argues "the Bureau must give notice of substantially its entire case *prior* to terminating benefits *and* it must give a

timely hearing. It has done *neither* in this case." Sjostrand further asserts: "It is not enough merely to reinstate Sjostrand's benefits for the seven month period that it took for him to have a hearing on his claim. On the contrary, at a *minimum,* Sjostrand's disability benefits must be reinstated—as a sanction—through the date of this Court's decision."

[¶ 34] In its initial November 22, 1999, Notice, the Bureau gave Sjostrand a five-page summary of the evidence the Bureau was relying upon to terminate Sjostrand's benefits. In that summary, the Bureau did "give notice of substantially its entire case *prior* to terminating benefits." In its amended November 24, 1999, Notice, the Bureau notified Sjostrand his benefits would be terminated December 15, 1999. The Notice also advised Sjostrand: "If you believe this decision is wrong, you must *write to the Bureau within 30 days* of when this Notice was mailed asking to have the decision reconsidered."

[¶ 35] By letter of December 17, 1999, Sjostrand's attorney advised a Bureau claims analyst "the Bureau's decision is 'wrong'" and further advised the Bureau:

if it nonetheless proceeds in terminating benefits as threatened in the November 24, 1999 letter, Mr. Sjostrand reserves the right to seek appropriate sanctions against the Bureau for its disregard of the rights of not only Mr. Sjostrand, but its 'systemic disregard' of the rights of all injured workers who similarly have had their benefits terminated in violation of injured workers' statutory and constitutional rights.

In a January 25, 2000, letter, Sjostrand's attorney demanded " 'an administrative order' ... be issued 'within 60 days' of my December 17, 1999 letter."

[¶ 36] On February 2, 2000, the Bureau issued an order stating Sjostrand forfeited all additional disability and other benefits in connection with the claim. By letter of February 21, 2000, Sjostrand's attorney demanded "that the Bureau request appointment of an Administrative Law Judge (ALJ) *immediately* " and further demanded "there be absolutely no further 'investigation' or 'discovery' by the Bureau's outside counsel in this case so as not to delay a hearing on this matter." He also advised the Bureau that "Mr. Sjostrand will not allow any undue delays in putting the Bureau to its strictest proof regarding the allegations against him" and expressed his view that 14 days would be sufficient time for requesting appointment of an administrative law judge.

[¶ 37] On March 7, 2000, the Bureau requested the Office of Administrative Hearings appoint an ALJ. An ALJ was appointed to hear the matter, and on March 13, 2000, he issued a notice that an administrative hearing would be held May 24, 2000. On March 14, 2000, Sjostrand requested the ALJ to approve discovery interrogatories to the Bureau, and requested an order protecting Sjostrand from Bureau discovery, an independent medical examination, or any further investigation of the matter by the Bureau. On March 28, 2000, the ALJ issued an order granting Sjostrand's discovery request and denying his request for a protective order.

[¶ 38] By motion of May 3, 2000, the Bureau sought a continuance to take a deposition of Dr. Yue, who was not available for a deposition before June 14, 2000, about disparities between Dr. Yue's 1999 Functional Capacity Questionnaire and a 1995 Functional Capacities Evaluation Summary Report offered into evidence by Sjostrand in an April 27, 2000, discovery deposition of Dr. Peterson. The ALJ continued the scheduled May 24, 2000, hearing.

[¶ 39] The Bureau took a deposition of Dr. Yue after it suspended Sjostrand's benefits, which Sjostrand argues was improper under *Stewart v. North Dakota Workers Comp. Bureau,* 1999 ND 174, 599 N.W.2d 280. We said:

> The procedure approved in *Mathews* and adopted in *Beckler,* which allows termination of benefits without a pretermination hearing if there is notice, a summary of the evidence, and an opportunity to respond, clearly envisions that the Bureau will conduct its investigation and marshal its evidence before the NOID is issued.
>
> . . . .
>
> The Bureau is not free to terminate benefits on a hunch of wrongdoing, hoping that a subsequent investigation will reveal evidence supporting its position . . . . The Bureau must conduct its investigation on its own nickel, not on the disabled worker's.

*Id.* at ¶¶ 24–26. However, we also said "[w]e do not suggest the Bureau is precluded from considering evidence which comes to light after it issues a NOID and terminates benefits." *Id.* at ¶ 29 n. 6. From our review of the record, we conclude there is evidence to support the ALJ's determination that "Dr. Yue's testimony was obtained by deposition not for discovery purposes, as part of a continuing investigation, but rather to be offered as the testimony of a witness at the hearing" requested by Sjostrand, and the ALJ's recommended conclusion of law that "[t]he Bureau's decision and action to obtain the testimony of Dr. Yue by deposition for the hearing of this matter was not 'post-benefit termination discovery,' as Sjostrand describes the action."

[¶ 40] The hearing was conducted on June 23 and July 14, 2000. On November 22, 2000, the ALJ issued recommended findings of fact, conclusions of law, and order, which the Bureau adopted on December 27, 2000.

[¶ 41] In *Stewart v. North Dakota Workers Comp. Bureau,* 1999 ND 174, ¶ 21, 599 N.W.2d 280 (citations omitted), we said:

> The due process clause requires that the post-deprivation hearing be provided at a meaningful time. At some point, a delay in the post-termination evidentiary hearing becomes a constitutional violation.

*Stewart* involved a period of about 15 months between termination of benefits and the post-termination evidentiary hearing and we found it untimely. In *Jacobson v. North Dakota Workers Comp. Bureau,* 2000 ND 225, ¶ 20, 621 N.W.2d 141, we held the Bureau's delay of 16 months between its July 1997 termination of benefits and its November 1998 hearing "did not afford Jacobson a timely remedy, violating his due process rights." Here, however, only about six months passed between termination of Sjostrand's benefits on December 15, 1999, and the first day of the post-termination evidentiary hearing, during which Sjostrand engaged in discovery and the Bureau took a hearing deposition of Dr. Yue, who was not available before June 14, 2000. We conclude the delay between the termination of Sjostrand's benefits and the post-termination evidentiary hearing was not undue. We, therefore, conclude Sjostrand has not shown any delay requiring an order of contempt or other remedy.

## VII

[¶ 42] The district court judgment affirming the Bureau's order is affirmed.

[¶ 43] DALE V. SANDSTROM, CAROL RONNING KAPSNER and WILLIAM A. NEUMANN, JJ, concur.

MARING, Justice, dissenting.

[¶ 44] Because I am of the opinion the Bureau must prove a violation of N.D.C.C. § 65–05–33 by clear and convincing evidence, I respectfully dissent.

I

[¶ 45] The sections of N.D.C.C. § 65–05–33, pertinent to this case provide:

1. A person who claims benefits or payment for services under this title or the employer of a person who claims benefits or payments for services is guilty of a class A misdemeanor if the person or employer does any one or more of the following:

a. Willfully files a false claim or makes a false statement in an attempt to secure payment of benefits or payment for services.

b. Willfully misrepresents that person's physical condition, including deceptive conduct which misrepresents that person's physical ability.

. . . .

3. In addition to any other penalties provided by law, the person claiming benefits or payment for services in violation of this section shall reimburse the bureau for any benefits paid based upon the false claim or false statement and, if applicable, under section 65–05–29 and shall forfeit any additional benefits relative to that injury.

N.D.C.C. § 65–05–33(1)(a)–(b), (3). The Bureau, as the party alleging a violation of N.D.C.C. § 65–05–33 in this case, has the burden of proof. *See North Cent. Good Samaritan Center v. N.D. Dept. of Human Servs.*, 2000 ND 96, ¶ 20, 611 N.W.2d 141 ("It is 'well-settled' the moving party has the burden of proof in administrative hearings."). Although the legislature has provided that preponderance of the evidence is the burden of proof a claimant must

meet when the burden is on the claimant to show an entitlement to benefits, *see* N.D.C.C. § 65–01–11, the legislature has not specified what burden of proof is on the Bureau when it alleges a violation of N.D.C.C. § 65–05–33. Therefore, this Court may supply the standard. *See Steadman v. S.E.C.*, 450 U.S. 91, 95–96, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) ("Where Congress has not prescribed the degree of proof which must be adduced . . . in an administrative proceeding, this Court has felt at liberty to prescribe the standard, for 'it is the kind of question which has traditionally been left to the judiciary to resolve.' ").

[¶ 46] N.D.C.C. § 65–05–33 does not specifically mention the words "fraud," or "deceit," subsections a and b of N.D.C.C. § 65–05–33(1) are substantially similar to the definition of fraud and deceit applied in other civil contexts. *See, e.g., Gershman v. Engelstad*, 160 N.W.2d 80, 85 (N.D.1968) ("In order to sustain an action for fraud, plaintiffs must show that the defendant made a false representation of a material fact, knowing it to be false, or made a representation as of knowledge, when he did not in fact know, with intent to induce the plaintiffs to rely on it, and, further, that the plaintiffs did in fact rely on it to their damage."); N.D.C.C. § 9–03–08 (listing "[t]he suggestion as a fact of that which is not true by one who does not believe it to be true" and "[a]ny other act fitted to deceive" as acts that constitute actual fraud when done "with intent to deceive another party thereto or to induce him to enter into the contract"); N.D.C.C. § 9–10–02 (listing "[t]he suggestion as a fact of that which is not true by one who does not believe it to be true" and "[t]he suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact" as acts constituting deceit). The burden of proof

generally applicable in a civil case is preponderance of the evidence. *See Steckler v. Steckler,* 492 N.W.2d 76, 80 (N.D.1992). However, when fraud or deceit is alleged in a civil case, it must be proved by clear and convincing evidence. *See Wagner v. Wagner,* 2000 ND 132, ¶ 12, 612 N.W.2d 555; *Sargent County Bank v. Wentworth,* 500 N.W.2d 862, 875 (N.D.1993); *State Bank of Kenmare v. Lindberg,* 471 N.W.2d 470, 474–75 (N.D.1991); *Fitzgerald v. Balkowitsch,* 288 N.W.2d 761, 763 (N.D.1980). Because of the similarities between N.D.C.C. § 65–05–33(1) and the civil definitions of fraud and deceit, and because the legislature has not provided a burden of proof for showing a violation of N.D.C.C. § 65–05–33, it, therefore, follows that the burden of proof this Court should supply is the same burden of proof applicable to an allegation of fraud or deceit in other civil contexts, i.e., clear and convincing evidence. In *Varbel v. Sandia Auto Electric,* 128 N.M. 7, 988 P.2d 317 (1999), the Court of Appeals of New Mexico reached the same conclusion in interpreting a statute similar to N.D.C.C. § 65–05–33:

The Act defines "fraud" as "the intentional misrepresentation of a material fact resulting in workers' compensation or occupational disablement coverage, the payment or withholding of benefits or an attempt to obtain or withhold benefits. The intentional misrepresentation of a material fact may occur through the conduct, practices, omissions or representations of any person." NMSA 1978, § 52–5–1.3(F) (1990). This is not unlike the definition of fraud New Mexico courts have applied in other contexts. *See, e.g., Cargill v. Sherrod,* 96 N.M. 431, 432–33, 631 P.2d 726, 727–28 (1981) ("Actionable fraud consists of misrepresentation of a fact, known to be untrue by the maker, and made with an intent to deceive and to induce the other party to act in reliance thereon to his detriment."). It is generally for the fact finder to determine whether fraud was proved.

A finding of fraud normally requires proof by clear and convincing evidence. For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with the abiding conviction that the evidence is true. Thus, coupled with our whole record review, we must determine whether the fact finder could properly determine that the clear and convincing evidence standard was met.

128 N.M. 7, 988 P.2d 317, 320–21 (1999) (citations and internal quotation marks omitted).

[¶ 47] Two primary reasons have been advanced by courts for relying on the clear and convincing evidence burden of proof in civil cases involving allegations of fraud. *See* Roger D. Colton, *Heightening the Burden of Proof in Utility Shutoff Cases Involving Allegations of Fraud,* 33 Howard L.J. 137, 147 (1990). The first reason is there exists a natural presumption that individuals are honest and act with correct motives which can only be overcome by clear and convincing evidence to the contrary. *See Rhoads v. Harvey Publications, Inc.,* 145 Ariz. 142, 700 P.2d 840, 844 (1984); *Peters v. Woodman Accident & Life Co.,* 170 Neb. 861, 104 N.W.2d 490, 497 (1960). The second reason advanced by some courts is that fraud falls into a class of civil cases which carry with them a stigma of bad faith and a judgment which is akin to a finding of guilt. *See Riley Hill Gen. Contractor, Inc. v. Tandy Corp.,* 303 Or. 390, 737 P.2d 595, 603 (1987); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 457–58 (1980). There is no authority which indicates these reasons

are not equally applicable to a case in which an individual is alleged to have fraudulently obtained workers' compensation benefits. In fact, a case brought by the Bureau against a claimant for a violation of N.D.C.C. § 65–05–33 is an especially strong candidate for the application of the clear and convincing standard of proof when one considers that a claimant who is found to have violated N.D.C.C. § 65–05–33 may also be subjected to a criminal prosecution and found guilty of a class A misdemeanor or a class C felony. *See* N.D.C.C. § 65–05–33(1), (2); *see also Wangen*, at 457 (stating that the clear and convincing evidence standard has been required in cases involving fraud and civil actions involving criminal acts). Furthermore, due to the natural presumption against fraud, requiring the Bureau to prove a violation of N.D.C.C. § 65–05–33 by clear and convincing evidence is consistent with the legislature's practice of requiring presumptions under the Workers Compensation Act to be rebutted by clear and convincing evidence. *See* N.D.C.C. § 65–05–15(1) (*period of acute care for some compensable injuries* "is presumed to be sixty days ... absent clear and convincing evidence to the contrary"); N.D.C.C. § 65–05–15(3) (aggravation benefits are presumed payable on a fifty percent basis unless the presumption is rebutted with "clear and convincing evidence to the contrary"); N.D.C.C. § 65–05–35(2) (a claim presumed closed may not be reopened "unless the presumption is rebutted by clear and convincing evidence that the work injury is the sole cause of the current symptoms").

## II

[¶ 48] Relying on *Steadman v. S.E.C.*, 450 U.S. 91, 95–96, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981), the majority rejects the clear and convincing evidence burden of proof for a violation of N.D.C.C. § 65–05–33 because it concludes N.D.C.C. § 65–05–

33 "does not provide a specific standard differing from the general standard of a preponderance of the evidence specified for *judicial review* of an administrative agency's findings of fact in N.D.C.C. ch. 28–32." *See Majority Opinion* at ¶¶ 29–30 (emphasis added).

[¶ 49] The issue in *Steadman* was whether in administrative hearings, violations of antifraud provisions of federal securities law must be proved by clear and convincing evidence rather than by a preponderance of the evidence. *See* 450 U.S. at 92, 101 S.Ct. 999, 67 L.Ed.2d 69. In resolving this issue, the Court quoted the following language from section 7(c) of the Administrative Procedure Act:

"Except as otherwise provided by statute, the proponent of a rule or order has the burden of proof. Any oral or documentary evidence may be received, but the agency as a matter of policy shall provide for the exclusion of irrelevant, immaterial, or unduly repetitious evidence. A sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and *in accordance with* the reliable, probative, and *substantial evidence*."

*See Steadman*, at 98, 101 S.Ct. 999, 67 L.Ed.2d 69 (quoting section 7(c), 5 U.S.C. § 556(d)). The Court reasoned that "[t]he language of the statute itself implies the enactment of a standard of proof." *Id.* Because the legislative history of section 7(c) specifically stated that Congress intended this standard to be preponderance of the evidence, the Court held preponderance of the evidence was the applicable standard of proof for violations of antifraud provisions of federal securities law. *See id.* at 102–03, 101 S.Ct. 999, 67 L.Ed.2d 69.

[¶ 50] In contrast to the Administrative Procedure Act at issue in *Steadman*,

North Dakota's Administrative Agencies Practice Act, N.D.C.C. ch. 28–32, does not contain a provision similar to section 7(c), 5 U.S.C. § 556(d), from which a standard of proof can be implied. Rather, N.D.C.C. ch. 28–32 only contains provisions governing the standards for judicial review of administrative findings of fact. *See* N.D.C.C. §§ 28–32–19, 28–32–21.[3] In *Steadman*, the Court rejected the petitioner's argument that section 7(c) of the Administrative Procedure Act was merely a judicial review provision and went to great lengths to distinguish section 7(c) from the judicial review provision of that Act:

> Unlike § 10(e), the APA's explicit "Scope of review" provision that declares that agency action shall be held unlawful if "unsupported by substantial evidence," § 7(c) provides that an agency may issue an order only if that order is "supported by and in *accordance with* ... substantial evidence" (emphasis added). The additional words "in accordance with" suggest that the adjudicating agency must weigh the evidence and decide, based on the weight of the evidence, whether a disciplinary order should be issued. The language of § 7(c), therefore, requires that the agency decision must be "in accordance with" the weight of the evidence, not simply supported by enough evidence to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. Obviously, weighing evidence has relevance only if the evidence on each side is to be measured against a standard of proof which allocates the risk of error. Section 10(e), by contrast, does not permit the reviewing court to weigh the evidence, but only to determine that there is in the record such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It is not surprising, therefore, in view of the entirely different purposes of § 7(c) and § 10(e), that Congress intended the words "substantial evidence" to have different meanings in context. Thus, petitioner's argument that § 7(c) merely establishes the scope of judicial review of agency orders is unavailing.

*Steadman*, at 98–100, 101 S.Ct. 999, 67 L.Ed.2d 69 (citations, footnotes, and quotation marks omitted). Furthermore, the Court in *Steadman* distinguished a prior case in which it required findings of fact at a deportation proceeding to be established by clear and convincing evidence on the basis that "deportation proceedings were not subject to the [Administrative Procedure Act], and the Immigration and Nationality Act (INA) did not prescribe a standard of proof, only the scope of judicial review." *Steadman*, at 102 n. 22, 101 S.Ct. 999, 67 L.Ed.2d 69.

[¶ 51] Thus, as *Steadman* illustrates, the fact that N.D.C.C. §§ 28–32–19 and 28–32–21 limit the scope of judicial review of an agency's findings of fact to whether the findings are supported by a preponderance of the evidence, in no way precludes the application of the clear and convincing evidence burden of proof to a hearing before the Bureau on a violation of N.D.C.C. § 65–05–33. *See Steadman*, at 102 n. 22, 101 S.Ct. 999, 67 L.Ed.2d 69. Furthermore, if the legislature did truly intend to provide a burden of proof in N.D.C.C. ch.

---

**3.** Section 28–32–46, N.D.C.C., provides additional grounds for a court to reverse an administrative agency decision, effective August 1, 2001. Sjostrand filed his notice of appeal on January 26, 2001, therefore, former N.D.C.C. §§ 28–32–19 and 28–32–21 apply rather than N.D.C.C. §§ 28–32–46, 28–32–49.

*See Henderson v. N.D. Dept. of Transp.*, 2002 ND 44, ¶ 6 n. 2, 640 N.W.2d 714 (noting that the date the appeal from an administrative agency decision is filed determines whether the new version of N.D.C.C. § 28–32–46 applies).

28–32, it seems odd that it would choose to do so in statutes governing judicial review of administrative agency decisions, *see* N.D.C.C. §§ 28–32–19, 28–32–21, but make no mention of any burden of proof in the statute governing the procedure for the presentation of evidence at administrative hearings, *see* N.D.C.C. § 28–32–11.1, or in the statute requiring administrative agencies to make findings of fact, *see* N.D.C.C. § 28–32–13.[4] *Cf. Steadman*, at 100 n. 20, 101 S.Ct. 999, 67 L.Ed.2d 69 ("[I]t is implausible to think that the drafters of the APA would place a scope-of-review standard in the middle of a statutory provision designed to govern evidentiary issues in adjudicatory proceedings."). In concluding the legislature has provided a standard of proof through the enactment of N.D.C.C. §§ 28–32–19 & 28–32–21, the majority opinion "overlooks the different functions of initial decision making and judicial review of it." *Steadman*, at 100 n. 20, 101 S.Ct. 999, 67 L.Ed.2d 69; *see also Hopper v. Indus. Commission*, 27 Ariz. App. 732, 558 P.2d 927, 929 (1976) ("It is beyond question in this jurisdiction that a claim of fraud must be established by clear and convincing evidence. The purpose of the 'clear and convincing' standard is to guide the trier of fact in the consideration of the evidence. It is not a test to be applied by an appellate court in passing on the sufficiency of the evidence." (citations omitted)); *Fitzgerald v. Balkowitsch*, 288 N.W.2d 761, 763 n. 3 (N.D.1980) ("It should be noted that proof of fraud by clear and convincing evidence is a standard to be utilized by the trial court in its determination of whether or not fraud has been committed. This court, as an appellate court, reviews the findings of the trial court, utilizing the Rule 52(a), N.D.R.Civ. P., 'clearly erroneous' standard.").

4. Sections 28–32–11.1 and 28–32–13, N.D.C.C., were renumbered as N.D.C.C. §§ 28–32–35 and 28–32–39, effective August 1, 2001. The former version of these statutes

III

[¶ 52] Because the legislature has not provided a standard of proof applicable at a hearing before the Bureau on an alleged violation of N.D.C.C. § 65–05–33, this Court may supply one. *See Steadman*, 450 U.S. at 95–96, 101 S.Ct. 999, 67 L.Ed.2d 69 ("Where Congress has not prescribed the degree of proof which must be adduced ... in an administrative proceeding, this Court has felt at liberty to prescribe the standard, for 'it is the kind of question which has traditionally been left for the judiciary to resolve.' "). Based on the similarities between N.D.C.C. § 65–05–33 and the definitions of fraud and deceit in other civil contexts, the correct standard of proof to apply is clear and convincing evidence. Because the Bureau did not apply this standard, I would reverse and remand for findings of fact under the correct standard of proof.

[¶ 53] Mary Muehlen Maring

are cited to because the hearing before the Bureau in this case took place prior to August 1, 2001.