2006 ND 185

**Abraham A. UNGAR, Plaintiff and Appellant**

v.

**NORTH DAKOTA STATE UNIVERSITY, Defendant and Appellee.**

No. 20050340.

Supreme Court of North Dakota.

Aug. 24, 2006.

Rehearing Denied Oct. 17, 2006.

John J. Gosbee, Gosbee Law Office, Mandan, N.D., for plaintiff and appellant.

Tag C. Anderson, Assistant Attorney General, Office of Attorney General, Bismarck, N.D., for defendant and appellee.

CROTHERS, Justice.

[¶1] Abraham A. Ungar appeals from a summary judgment dismissing his claims against North Dakota State University ("NDSU"). We affirm, concluding the district court did not err in applying the doctrines of res judicata and collateral estoppel, and the court properly concluded Ungar failed to give timely notice under N.D.C.C. § 32–12.2–04 and failed to exhaust his remedies, we affirm.

I

[¶2] Ungar is a tenured professor at NDSU. Ungar's present action against NDSU stems from a letter of reprimand

that was issued to him on October 10, 2001, by the Dean of the College of Science and Mathematics and the Chair of the Department of Mathematics. The letter of reprimand addressed two performance issues, specifically that Ungar had improperly administered student evaluations and had inappropriately intimidated and harassed a junior colleague, Tuval Foguel. The letter of reprimand referred to a message written in Hebrew on the top of a document sent by Ungar to Foguel. The message also contained the Hebrew word "warning" written in red ink. Ungar does not dispute he sent the document to Foguel with a message written at the top; however, Ungar denied writing the word "warning." The letter of reprimand was amended on November 28, 2001, to include additional details regarding Ungar's failure to properly conduct student evaluations.

[¶ 3] Ungar appealed the letter of reprimand to NDSU's Standing Committee on Faculty Rights ("Committee"), an internal appeals body. After an evidentiary hearing, the Committee found by clear and convincing evidence there was a pattern of intimidation and harassment by Ungar, a full professor, against Foguel, a non-tenured, tenure-track faculty member. The Committee also found Ungar had improperly conducted student evaluations.

[¶ 4] In addition to the internal university appeal, in November 2001, Ungar sued Foguel for tortious interference with contract, alleging Foguel wrongfully caused NDSU to breach Ungar's contract when Foguel denied writing the word "warning" on the document. Ungar claimed damages for loss of salary increases, harm to his reputation, emotional distress, and costs associated with defending against the disciplinary action. The Attorney General's office, in conjunction with the Risk Management Division of the Office of Manage-ment and Budget ("OMB"), defended Foguel, arguing that under N.D.C.C. ch. 32–12.2, an action against a state employee for alleged wrongful action taken within the scope of employment is not authorized and the action must be brought against the State.

[¶ 5] On September 4, 2002, Ungar submitted a notice of claim to OMB under N.D.C.C. § 32–12.2–04(1) alleging violations of his contractual and constitutional rights and seeking damages. OMB denied Ungar's notice of claim as untimely. In September 2003, the district court dismissed Ungar's action against Foguel for lack of subject-matter jurisdiction because Ungar had not filed a timely notice of claim with OMB as required by N.D.C.C. § 32–12.2–04. In dismissing, the court found it was "undisputed that both [Ungar and Foguel] were employed by [NDSU] at the time of the occurrence of these matters." The court also found "that the incident or incidence complained of by [Ungar] occurred during and in the course of [their employment]." The court concluded that "as a result [Foguel] is a state employee under N.D.C.C. § 32–12.2–04(1)" and that Ungar failed to comply with that statute's notice requirements. Ungar did not appeal that decision.

[¶ 6] In October 2004, Ungar commenced the present action against NDSU, asserting breach of contract, retaliation, and fraud. After receiving Ungar's discovery requests, NDSU moved to stay discovery and for dismissal under N.D.R.Civ.P. 12 and 56, arguing Ungar's action was barred by res judicata and collateral estoppel, and to the extent the complaint could be construed as raising claims against NDSU arising after the prior action was dismissed, those claims were barred by Ungar's failure to exhaust administrative remedies and timely file a notice of claim.

[¶ 7] The district court granted NDSU's motion for summary judgment. The court concluded Ungar's notice of claim filed in September 2002 with OMB was more than 180 days after the discovery of the injury and was properly denied by OMB as untimely. The court held it lacked subject-matter jurisdiction over Ungar's claims, other than his breach of contract claims, because he failed to give timely notice to OMB and had not exhausted his remedies through the administrative process at NDSU. The court further held Ungar's breach of contract claim was barred by the doctrines of res judicata and collateral estoppel. The court concluded that these claims were barred by the unappealed judgment dismissing Ungar's prior action against Foguel. The court reasoned that NDSU was in privity with Foguel, and therefore, Ungar's present claim is barred by res judicata and collateral estoppel because Ungar's claims in the present action stemmed from the conduct of NDSU and Foguel, which was adjudicated in Ungar's action against Foguel.

## II

[¶ 8] Whether a district court properly granted summary judgment is a question of law, which we review de novo on the entire record. *Peterson v. North Dakota Univ. Sys.*, 2004 ND 82, ¶ 6, 678 N.W.2d 163.

> [S]ummary judgment . . . is a procedural device under N.D.R.Civ.P. 56 for prompt and expeditious disposition of a controversy without a trial if either party is entitled to judgment as a matter of law, and if no dispute exists as to either the material facts or the inferences to be drawn from undisputed facts, or if resolving disputed facts would not alter the result. On appeal, we review the evidence in the light most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which reasonably can be drawn from the evidence. The party moving for summary judgment bears the burden of establishing there is no genuine issue of material fact and that, under applicable principles of substantive law, [the movant] is entitled to judgment as a matter of law.

*Id.* (quoting *Green v. Mid Dakota Clinic*, 2004 ND 12, ¶ 5, 673 N.W.2d 257 (citations omitted)).

## III

[¶ 9] Ungar argues his action against Foguel does not preclude this action against NDSU and he has the right to appeal NDSU's discipline once he exhausted his internal remedies at NDSU. NDSU argues the district court properly held Ungar's claims are barred by res judicata and collateral estoppel.

[¶ 10] The doctrines of res judicata and collateral estoppel bar courts from relitigating claims and issues in order to promote the finality of judgments, which increases certainty, avoids multiple litigation, wasteful delay and expense, and ultimately conserves judicial resources. *Simpson v. Chicago Pneumatic Tool Co.*, 2005 ND 55, ¶ 8, 693 N.W.2d 612; *Riemers v. Peters–Riemers*, 2004 ND 153, ¶ 9, 684 N.W.2d 619. The applicability of res judicata or collateral estoppel is a question of law, fully reviewable on appeal. *See Hofsommer v. Hofsommer Excavating, Inc.*, 488 N.W.2d 380, 383 (N.D.1992).

[¶ 11] "Although collateral estoppel is a branch of the broader law of res judicata, the doctrines are not the same." *Id.* Res judicata, or claim preclusion, prevents relitigation of claims that were raised, or could have been raised, in prior actions between the same parties or their privies. *Id.* Thus, res judicata means a valid, existing final judgment from a court

of competent jurisdiction is conclusive with regard to claims raised, or those that could have been raised and determined, as to their parties and their privies in all other actions. *Peacock v. Sundre Twp.*, 372 N.W.2d 877, 878 (N.D.1985). Res judicata applies even if subsequent claims are based upon a different legal theory. *See Littlefield v. Union State Bank*, 500 N.W.2d 881, 884 (N.D.1993). Collateral estoppel, or issue preclusion, forecloses relitigation of issues of either fact or law in a second action based on a different claim, which were necessarily litigated, or by logical and necessary implication must have been litigated, and decided in the prior action. *Hofsommer*, 488 N.W.2d at 383. For purposes of both res judicata and collateral estoppel, only parties or their privies are bound by an earlier judgment. *Id.* at 384.

[¶ 12] This Court has adopted an "expanded" version of privity for res judicata and collateral estoppel. *Simpson*, 2005 ND 55, ¶ 10, 693 N.W.2d 612. "[P]rivity exists if a person is so identified in interest with another that he represents the same legal right." *Hofsommer*, 488 N.W.2d at 384 (internal quotation omitted). In *Hofsommer*, at 384 (quoting *Stetson v. Investors Oil, Inc.*, 176 N.W.2d 643, 651 (N.D.1970)), we said:

"The strict rule that a judgment is operative, under the doctrine of res judicata, only in regard to parties and privies, is sometimes expanded to include as parties, or privies, a person who is not technically a party to a judgment, or in privity with him, but who is, nevertheless, connected with it by his interest in the prior litigation and by his right to participate therein, at least where such right is actively exercised by prosecution of the action, employment of counsel, control of the defense, filing of an answer, payment of expenses or costs of the action, the taking of an appeal, or the doing of such other acts as are generally done by parties."

"Fundamental fairness underlies any determination of privity." *Hofsommer*, at 384. A judgment on the merits exonerating a party from liability precludes a subsequent action against a party whose liability, if any, is derivative of or secondary to the exonerated party. *Medearis v. Miller*, 306 N.W.2d 200, 203 (N.D.1981).

[¶ 13] Ungar argues the district court erred by dismissing his action against NDSU based on res judicata. He claims that once he exhausted his administrative remedies with his internal appeal to the Committee, he was entitled to appeal his disciplinary action to the district court.

[¶ 14] However, the timing of Ungar's prior action with respect to the letters of reprimand and the initial complaint against Foguel, in addition to the ultimate Committee hearing and decision, is crucial. The initial letter of reprimand signed by the Chairman of the Department of Mathematics and the Dean of the College of Science and Mathematics was issued on October 10, 2001. This letter of reprimand was amended on November 28, 2001, to include additional details about Ungar's failure to follow proper procedures for student evaluations. On November 29, 2001, Ungar commenced his action against Foguel "in his personal capacity." Ungar's prior complaint indicates he attached a copy of the initial letter of reprimand to that complaint. Ungar also specifically alleged in his complaint against Foguel, "Because the Letter was not based on justifiable cause, its issuance was a breach of Ungar's contract with NDSU.... Although the Letter alludes to another alleged deficiency in Ungar's work, namely the handling of student evaluations ... the Letter would not have been issued but for Foguel's instigation."

[¶ 15] In April 2002, while his action against Foguel was pending in the district court, the Committee held a hearing on Ungar's claims. On May 10, 2002, the Committee denied Ungar's claims. On June 20, 2002, the letter of reprimand was amended a second time to include further facts supporting the original reasons for discipline, mainly, the failure to conduct appropriate student evaluations and inappropriate harassment of a non-tenured faculty member. Ungar challenged the Committee's decision in a July 1, 2002, letter to NDSU President Joseph Chapman, who took no apparent action on the Committee's decision. Ungar provided a notice of claim to OMB in a letter dated September 4, 2002. On September 10, 2002, OMB denied Ungar's claim regarding the letters of reprimand, concluding his claim was untimely. Finally, Ungar's action against Foguel was dismissed on September 3, 2003, almost a year after Ungar's notice to OMB.

[¶ 16] Although Ungar attempts to characterize his present action, in part, as an "appeal" of the Committee's decision based solely on the relief he has requested, his present action is not an appeal. *See Rudnick v. City of Jamestown*, 463 N.W.2d 632, 636 (N.D.1990) (a district court does not have appellate jurisdiction unless authorized by statute). *Cf. Peterson*, 2004 ND 82, ¶ 12, 678 N.W.2d 163 (terminated tenured faculty member must bring separate action in district court because no statute or rule provided an appeal to the district court); *Schauer v. Jamestown College*, 323 N.W.2d 114, 115–16 (N.D.1982) (nonrenewed private college professor's employment was contractual and nonstatutory in nature). Ungar's complaint against NDSU asserts claims based on breach of contract, in addition to a tort claims for retaliation and fraud. These claims and requested relief could have been raised in his prior action, which

was ultimately determined to be against NDSU and dismissed more than a year after the Committee's final decision. Ungar did not appeal the dismissal of his prior action.

[¶ 17] Ungar nevertheless claims the prior lawsuit is not preclusive of his present action because the prior action asserted Foguel's conduct was outside of the scope of his employment. Ungar's argument improperly attempts to collaterally attack the unappealed judgment in the prior action. NDSU's actions relating to the letters of reprimand occurred while Ungar's action against Foguel was pending. The prior action included allegations that Foguel had caused NDSU to breach its employment contract with Ungar. The district court in the present action found, "The State, on behalf of NDSU, represented Foguel in the prior action due to his employment as a professor. . . . The incidents Ungar claims in the instant action stem from the conduct of NDSU and Foguel which were adjudicated in the Foguel action."

[¶ 18] NDSU not only participated in the prior litigation by defending its faculty member, but also maintained that the action was actually against the State, not one of its employees. Although Ungar now argues the district court in the prior action improperly found NDSU and Foguel to be in privity, Ungar is collaterally estopped from attacking the prior unappealed decision.

[¶ 19] The defendant junior faculty member in the prior action and the defendant NDSU in present action had the same interests, such that NDSU represents the same legal right in this case. We agree with NDSU's assertion that substantially all of Ungar's claims could have been brought in his prior action. For these reasons, we hold the district court

did not err in applying the doctrines of res judicata and collateral estoppel to bar Ungar's claims in this action.

## IV

▆ [¶ 20] The district court also held it did not have subject-matter jurisdiction over Ungar's tort claims based upon Ungar's failure to give timely notice to OMB and failure to exhaust his remedies. While conceding his notice of claim to OMB was untimely for some of his claims, Ungar now argues his notice of claim was timely for other tort claims, which he should be permitted to pursue.

[¶ 21] Ungar essentially asserts that there is a "continuing series of torts" which occurred within the 180–day period before his September 2002 notice of claim to OMB and which occurred after his notice to OMB. Ungar also argues, somewhat contradictorily, that he should be "allowed to pursue his claim for discrete events" occurring within 180 days before his notice of claim and after his notice.

▆ [¶ 22] Section 32–12.2–04(1), N.D.C.C., requires a claim against a state employee to be presented to OMB within 180 days after the injury is discovered and provides in part:

> A person bringing a claim against the state or a state employee for an injury shall present to the director of the office of management and budget within one hundred eighty days after the alleged injury is discovered or reasonably should have been discovered a written notice stating the time, place, and circumstances of the injury, the names of any state employees known to be involved, and the amount of compensation or other relief demanded.

For the district court to have subject-matter jurisdiction over his claims, Ungar must comply with both the N.D.C.C. § 32–

12.2–04 notice of claim requirements and the requirement that he exhaust his administrative remedies. *See Cooke v. University of North Dakota*, 1999 ND 238, ¶¶ 9–11, 603 N.W.2d 504 (holding N.D.C.C. § 32–12.2–04(1) notice of claim requirement and exhaustion of remedies requirement are consistent and a party must comply with both); *Dimond v. State ex rel. State Bd. of Higher Educ.*, 1999 ND 228, ¶¶ 24–26, 603 N.W.2d 66 (barring tort claim for failure to comply with N.D.C.C. § 32–12.2–04); *see also Thompson v. Peterson*, 546 N.W.2d 856, 863 (N.D.1996) (exhaustion of remedies requirement also applied to constitutional claims). The director of OMB denied Ungar's claims on September 10, 2002, stating:

> Mr. Ungar's Notice states that the basis of his claim is three letters, the first of which is dated October 10, 2001. Accordingly, the time period in which the statute requires a claim to have been filed would have ended, at the latest, in April 10, 2002. The mere fact that the letter was subsequently modified after Mr. Ungar exercised his internal grievance rights does not extend the time period in which a notice of claim must be submitted.

In disposing of Ungar's retaliation claims, the district court relied on Ungar's failure to provide timely notice to OMB and failure to exhaust his remedies. To the extent Ungar implies on appeal, and argued to the district court, that his notice of claim was timely because his injury did not occur until the Committee rendered its decision in May 2002, this Court rejected a similar argument in *Cooke*, 1999 ND 238, ¶¶ 13–14, 603 N.W.2d 504. Cooke had failed to satisfy the notice of claim requirement because her injury, and allegedly discriminatory appointment, was discovered more than 180 days before she presented notice to OMB. *Id.* at ¶ 13. Cooke unsuccessfully argued her injury did not

"crystallize" until after the administrative process rejected her claim. *Id.* We held the outcome of the administrative process could not be the cause of Cooke's alleged injury. *Id.*

[¶ 23] Relying on *Cooke*, the district court here found, "Similarly, the alleged injury to Ungar was discovered when Ungar received his letter of reprimand, dated October 10, 2001. Therefore, Ungar's notice was more than 180 days after discovery of the injury and properly rejected by OMB as untimely." The district court concluded:

> Ungar's notice to OMB states that the claim against NDSU and State is based on the evidence provided in the notice, but specifically asserts seven alleged violations of his contractual and constitutional rights, none of which delineate an act of retaliation. To date, Ungar has not filed notice with OMB in regard to the retaliation claim; therefore, the Court lacks jurisdiction over the retaliation claim due to Ungar's failure to comply with notice requirements and the Court must dismiss the retaliation claim.

Addressing the issue of exhaustion of remedies, the district court also concluded "Ungar's retaliation tort claim is not properly before [the district court] because he has not exhausted his remedies through the administrative process, nor has he filed proper notice with OMB."

[¶ 24] On appeal, Ungar concedes his notice of claim to OMB was untimely with regard to some of his claims. Ungar argues there is "a continuing series of torts" which occurred in the 180–day period before his September 2002 notice and even after his notice. Ungar refers this Court to his amended complaint in this action, specifically paragraphs 11 and 14 relating to the April 2002 Committee hearing and alleged retaliation occurring after the Committee's process. These claims were not part of the internal appeals process which occurred here; thus, the district court was correct in concluding Ungar had not exhausted his remedies with regard to such claims. Additionally, to the extent that Ungar asserts his September 2002 notice of claim should also apply to "discrete" claims occurring after his notice, this issue does not appear to have been raised to the district court below. Nonetheless, we reject Ungar's attempts to simultaneously characterize his various claims as both "discrete," to avoid the notice of claim requirement, and a "continuing series of torts" to avoid the exhaustion of remedies requirement.

[¶ 25] We conclude the district court properly found that Ungar's notice of claim was untimely and that he failed to exhaust his remedies regarding his retaliation claims, which allegedly occurred in response to Ungar's exercise of his faculty rights. To the extent Ungar's claims were not already barred by res judicata and collateral estoppel, we hold the district court properly dismissed Ungar's remaining claims against NDSU based upon his failure to exhaust his internal administrative remedies and failure to file timely notice with OMB.

V

[¶ 26] The district court judgment is affirmed.

[¶ 27] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, CAROL RONNING KAPSNER, and DALE V. SANDSTROM, JJ., concur.