2008 ND 178

**Jody DRAYTON, Claimant
and Appellee**

v.

**WORKFORCE SAFETY AND
INSURANCE, Appellant**

and

**WW Wallwork, Inc., Respondent.**

**No. 20070281.**

Supreme Court of North Dakota.

Sept. 25, 2008.

Rehearing Denied Oct. 28, 2008.

David A. Garaas, Garaas Law Firm, Fargo, N.D., for claimant and appellee.

Jacqueline Sue Anderson, Special Assistant Attorney General, Fargo, N.D., for appellant.

SANDSTROM, Justice.

[¶ 1] Workforce Safety and Insurance ("WSI") appeals from a district court judgment reversing a WSI order reinstating Jody Drayton's disability benefits to the date of their termination and awarding her attorney's fees. We conclude that WSI appropriately exercised its continuing jurisdiction to assess Drayton's vocational rehabilitation; that Drayton was properly found in noncompliance with vocational rehabilitation; and that a reasoning mind could reasonably find Drayton intentionally manipulated the results of a functional capacity assessment and engaged in "a first instance of noncompliance" with vocational rehabilitation without good cause. We also conclude the district court erred in awarding Drayton attorney's fees under N.D.C.C. § 28–32–50. We therefore reverse the district court judgment and reinstate WSI's order discontinuing Drayton's temporary disability benefits.

I

[¶ 2] In August 1993, Drayton was injured in a motor vehicle accident while employed by W.W. Wallwork, Inc. Drayton filed a claim for workers compensation benefits, which was accepted. Drayton was subsequently unable to continue in her employment. In August 1997, Drayton was offered a modified job at Wallwork as a delivery coordinator based upon 1997 work restrictions from her chiropractor. Drayton refused this position. In November 1997, WSI suspended her partial disability benefits after she failed to return to work and did not accept a modified position. In November 1997, Drayton obtained employment with Jim Drayton Insurance, her husband's insurance agency, and WSI then began paying her temporary partial disability benefits based upon her earning capacity at that time.

[¶ 3] In December 2005, WSI began an internal review of her claim, gathering information on her current diagnosis and work release status. In January 2006, WSI received a letter from her chiropractor, Dr. Vincent Rokke, providing her present diagnosis included continuing neck and back pain, and specifically stating "cervical, thoracic and lumbar segmental dysfunctions resulting in myofascial pain in each region, left cervicobrachial syndrome and intermittent sciatica." Dr. Rokke said her treatment was unlikely to change from a palliative nature, or just easing her pain symptoms, requiring periodic chiropractic adjustments for pain management. Dr. Rokke stated that he did not believe a work-conditioning program would be effective in increasing Drayton's workday tolerance.

[¶ 4] In April 2006, WSI told Drayton to attend a functional capacity assessment ("FCA") at MeritCare Occupational Health. In May 2006, occupational therapist Bryce Nelson conducted an FCA and concluded in part that the result was invalid as a manipulated effort. On June 23, 2006, WSI issued an order suspending disability benefits and establishing a "first instance of noncompliance" with vocational rehabilitation, under N.D.C.C. § 65–05.1–04, permitting WSI to discontinue benefits if noncompliance continues. Drayton requested a hearing from that order. In July 2006, another FCA was scheduled at

MeritCare Occupational Health. Occupational therapist Dianne Nechiporenko conducted this FCA, concluding that the FCA was invalid on portions that Drayton had completed and that Drayton did not complete all of the FCA's portions.

[¶ 5] An evidentiary hearing was held in February 2007. After the hearing, the administrative law judge ("ALJ") recommended affirming WSI's June 2006 order suspending Drayton's disability benefits, which had found Drayton had engaged in a first instance of noncompliance without good cause:

11. ... On April 14, 2006, Dr. Rokke approved of Ms. Drayton's participation in the FCA.

12. WSI directed Ms. Drayton to attend an FCA at MeritCare in Fargo on May 12, 2006. The FCA was conducted by Bryce Nelson. Mr. Nelson determined Ms. Drayton had a spinal injury based upon his review of her medical records and because he asked her and she reported her injury involved her low back, neck, tailbone, and left arm as well as a closed head injury. He concluded the FCA Ms. Drayton participated in on May 12, 2006, was invalid and represented a manipulated effort based upon the protocols for determining validity of the test.

13. Mr. Nelson is a licensed occupational therapist with a bachelor of science degree from the University of North Dakota. He has been working at MeritCare for 16 years. He received initial training and has attended annual conferences in administering the Key Functional Assessment protocol (KFA). Mr. Nelson receives referrals to perform the KFA from WSI as well as from attorneys, chiropractors, physicians, and self-referrals for SSDI applications. He has done approximately 2500 FCAs using the KFA protocol. When he re-

ceives a referral he looks at the medical records to determine the area of injury, the diagnosis and medications being taken. Medications are considered in part because some medications affect heart rate and the KFA uses increase in heart rate as one of the indicators to determine consistency. He instructs each participant to pay attention to what they are doing and stop before they hurt themselves. He also tells them that he does not want them to overwork or under work themselves. He tells each of the assessment participants to let him know "what is going on," "when it is going on" and "when they need to stop." Testimony of Bryce Nelson.

. . . .

16. The May 12, 2006, FCA results in Ms. Drayton's case revealed many inconsistencies. She demonstrated an ability to stand for only one minute, but was able to walk for several minutes during a break immediately before the standing test. Her grip dynometer measurements were inconsistent with expected measurements, specifically the mid-grip measurement not being the largest. Ms. Drayton's heart rate never increased the expected 20 beats when lifting or 40 beats when climbing stairs. She only performed 2 repetitions of the foot pedal, but was able to walk up and down seven steps, which was more physically demanding. She could only do a half squat when asked to squat, but was able to do a full squat when lifting something from the floor with a container. When asked to walk she could only walk ten feet before she had to stop, yet on her breaks she walked more than a 100 feet. Moreover walking from station to station during the evaluation involved more than ten feet of walking. Mr. Nelson noted that during the squat Ms. Drayton said she might need to quit, so

he gave her the first break at which point she walked out the door and walked down the street to a point where he could no longer see her. With regard to pain reports, Mr. Nelson noted that she was able to spontaneously rotate her neck and flip her hair back. She reported pain when lifting 30 inches to 18 inches, but did not report pain lifting above her shoulders, a task that requires greater effort. Mr. Nelson also noted inconsistency when comparing how she moved as though limited during the test but walked freely during the breaks. He observed her sitting for 21 minutes while answering questions during the assessment. (Footnotes omitted.)

17. Bryce Nelson approved Ms. Drayton for receptionist and information clerk, customer service representative, and telemarketers positions if her sitting tolerances and workday tolerances were followed. The basis for Mr. Nelson's approval of these positions was the May 12, 2006, FCA results. Mr. Nelson felt she could do these jobs based upon the May 12, 2006, FCA even though it did not represent a true measure of her capabilities, because she demonstrated the ability to sit for 20 minutes, and she demonstrated that she could stand, walk, and sit during the three hours it took for the FCA. Mr. Nelson did not approve office clerk because this was in the light level of work. Mr. Nelson did not believe that Ms. Drayton could do an office clerk's job based upon the FCA because it requires her to lift more than she demonstrated. He acknowledged that Dr. Rokke says she could lift 30 pounds, but disputes the validity of this claim because it was not based upon any testing.

. . . .

19. On May 12, 2006, after the FCA, Ms. Drayton went to Dr. Rokke because she was having pain in her low back, mid-back and lower cervical spine. Dr. Rokke's notes reflect that she told him she had been having increasing symptoms since May 7, 2006, but that she attended an FCA that day and "pushed herself slightly." Pg. 519. Ms. Drayton reported to WSI that she could not drive home for a couple of hours after the FCA, but that May 12, 2006, was otherwise not different from any other day.

20. On May 23, 2006, WSI issued an order terminating Ms. Drayton's benefits for failure to comply with vocational rehabilitation without good cause. When Ms. Drayton requested a reconsideration, she stated she had been having pain before the FCA and she was not feeling well on the day of the FCA. She asked to repeat the FCA but requested a different evaluator.

21. Dianne Nechiporenko performed the second FCA on July 18, 2006, because she is the back up and a different therapist was requested. Additionally, Ms. Nechiporenko performed the FCA because when there is an invalid result, MeritCare has a policy to have the second assessment performed by another therapist who can bring a fresh view to the assessment. Ms. Nechiporenko instructed Ms. Drayton to tell her what was going on, when it was going on, when she thought she needed to stop and why she needed to stop.

22. Ms. Nechiporenko is an occupational therapist. She has been practicing in this field for 25 years. She has a certification in the Key Functional Assessment process and has completed between 50 and 100 KFAs. Currently she is a supervisor working mostly with hand therapy. She performs therapy only 5% of the time.

23. The July 18, 2006, FCA was not completed because Ms. Drayton terminated early. During the second FCA, Ms. Drayton took her first break after only 10 minutes, her second after 30 minutes and she terminated after that break. She completed only 13 of the test components. While Ms. Drayton did not complete enough of the FCA to determine an appropriate job, she did complete enough to determine that her efforts were inconsistent and that the FCA result was an invalid FCA. Ms. Drayton's test on the grip dynometer was the only valid test, but she only performed that one time because she terminated the test early. Ms. Drayton also demonstrated the ability to sit for 30 minutes. The other results of the second FCA were, like the results of the first, inconsistent. Ms. Drayton's heart rate did not become sufficiently elevated, her weights lifted did not follow the expected pattern, and the difference between the weights on the resistance dynometer were too great. Ms. Drayton's reports of pain were also inconsistent. She reported needing to lay down, but continued to walk around when given a break. Her "pain complaints were all over the map." Testimony of Ms. Nechiporenko. Ms. Nechiporenko acknowledged that the term "manipulated effort" was a term used by Key to define an invalid test result, but that there was no way to tell if the manipulation was conscious. (Footnotes omitted.)

24. Because the July 18, 2006, FCA results could not be used to establish work guidelines, Ms. Nechiporenko, disapproved all of the four positions identified ... for Ms. Drayton.

The ALJ also recommended, in part, the following conclusions of law:

7. The Key Functional Assessment system makes a record of circumstantial evidence that can be considered in determining if an individual's actions were intentional or not. The KFA system uses inconsistencies to determine invalidity of test results. It also uses objective measurements of heartbeat and weights to determine if an individual is making an effort and performing the test to the best of their ability. In this case, Ms. Drayton's conduct at the May 18[sic], 2006, FCA was inconsistent— when she was asked to walk for the test she refused due to pain, but her pain did not stop her from walking around the building during her break just prior to this request. Her heart rates were not near the expected rate that would show either that she was putting forth an effort or was having increased pain. Her behavior at the second FCA was not any more cooperative. She did not deny or even explain any of the findings of the FCA or any of the activities attributed to her when she testified other than to say she was having pain. But that assertion is not borne out by anything objective. Despite her claims of increased pain her pulse remained low, and her actions and pain complaints were not consistent. Both Ms. Drayton's FCA results were determined to be invalid based upon objective measurements. Neither Mr. Nelson nor Ms. Nechiporenko would determine that the manipulation was intentional. But that determination is not, as contended by Ms. Drayton, a medical determination that requires a doctor's opinion. Whether Ms. Drayton intentionally manipulated her test results must be determined by looking at the circumstances and her conduct. [*Dean v. North Dakota Workers Comp. Bur.*, 1997 ND 165, ¶ 20, 567 N.W.2d 626.] Considering all of the evidence in the record and especially the many inconsistencies and obvious failures to perform (e.g. refusing to

walk more than 10 feet when she had just walked more than 100 is a particularly troubling result) at either of the FCA's that is it is not difficult to conclude that the greater weight of the evidence in this case shows that Ms. Drayton willfully failed to participate to her fullest capacity in the FCAs.

8. With regard to whether there is sufficient evidence to support WSI's June 23, 2006, order, I conclude that considering all of the evidence in the record, the greater weight of the evidence shows that Ms. Drayton did not comply with the order to participate in the May 18[sic], 2006, FCA because she did not give a maximum consistent effort.

9. Ms. Drayton has also not demonstrated that she had good cause to fail the FCA. In part, this is a reflection of her argument that WSI is only in the "investigative" stages of the vocational rehabilitation process and therefore cannot impose the first instance of noncompliance penalty and her position that she did not fail to cooperate. But even if she had argued that she had good cause, I find that, when compared to her behaviors during the testing and on her breaks, the inconsistencies in her test results, do not support her claims that it was her pain that caused her to have inconsistent assessment results. (Footnote omitted.)

[¶ 6] WSI adopted the ALJ's recommended decision, concluding WSI had jurisdiction to issue its June 2006 order, the 2005 version of the relevant statutes applied, the greater weight of the evidence showed Drayton willfully failed to participate to her fullest in the FCAs, and Drayton did not demonstrate "good cause" for her failure to apply maximum consistent effort in the FCAs.

[¶ 7] Drayton appealed WSI's final order to the district court. The district court reversed WSI's final order. The court held that WSI's continuing jurisdiction is limited, administrative res judicata precluded WSI from changing Drayton's benefits, WSI's actions violated due process, and WSI failed to properly analyze and explain the evidence. The court also awarded Drayton attorney's fees under N.D.C.C. § 28–32–50. WSI appealed to this Court.

[¶ 8] Drayton's appeal to the district court was timely, and the district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 27–05–06, 65–10–01, and 28–32–42. WSI's appeal was timely under N.D.R.App.P. 4(a) and N.D.C.C. § 28–32–49. This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. § 28–32–49.

II

[¶ 9] Under the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32, courts exercise only a limited review in appeals from administrative agency decisions. *Tverberg v. Workforce Safety and Ins.*, 2006 ND 229, ¶ 7, 723 N.W.2d 676. Under N.D.C.C. §§ 28–32–46 and 28–32–49, the district court, and this Court on further appeal, must affirm an administrative agency decision unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶ 10] "WSI is responsible for weighing the credibility of witnesses and resolving conflicts in the evidence, and we do not 'make independent findings of fact or substitute our judgment for that of the agency.'" *Tverberg*, 2006 ND 229, ¶ 8, 723 N.W.2d 676 (citation omitted). This Court determines only "whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." *Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979). However, "[t]he interpretation of a statute is a question of law." *Reopelle v. Workforce Safety and Ins.*, 2008 ND 98, ¶ 9, 748 N.W.2d 722. Questions of law are fully reviewable on appeal from an administrative decision. *Id.*

[¶ 11] To determine a statute's meaning, we look to the statute's language, giving the statute's words their plain, ordinary, and commonly understood meaning. N.D.C.C. § 1–02–02. Statutes are construed as a whole and, if possible, are harmonized to give meaning to each word and phrase. N.D.C.C. § 1–02–07. If the statute's language is clear and unambiguous, "the letter of [the statute] is not to be disregarded under the pretext of pursuing its spirit." N.D.C.C. § 1–02–05.

## III

[¶ 12] WSI initially contends it properly exercised its continuing jurisdiction to review and investigate Drayton's current work status and utilize vocational rehabilitation services. Drayton argues that WSI did not properly initiate vocational rehabilitation services on her claim because WSI did not file a "formal" motion under N.D.C.C. § 65–05–04 and did not provide her notice and an opportunity to respond before proceeding.

[¶ 13] Section 65–05–04, N.D.C.C., provides in part that WSI "at any time, *on its own motion* or on application, may review the award, and in accordance with the facts found on such review, may end, diminish, or increase the compensation previously awarded...." (Emphasis added). Additionally, N.D.C.C. § 65–05.1–01(8)(a) provides that WSI may initiate vocational rehabilitation services "on its own motion." *See also* N.D.C.C. § 65–05.1–01(7)(a) (1993).

[¶ 14] We have explained that "WSI has continuing jurisdiction when an original claim has been timely filed, and WSI, on its own motion or on application, may review a previous decision and may end, diminish, or increase compensation previously awarded or, if compensation has been refused or discontinued, may award compensation." *Houn v. Workforce Safety & Ins.*, 2005 ND 115, ¶ 12, 698 N.W.2d 271 (citing N.D.C.C. § 65–05–04). Under N.D.C.C. § 65–05–04, WSI's decision whether or not to reopen a matter falls totally within its discretion. Furthermore, under this statute, "an unappealed WSI decision is res judicata unless WSI reopens the claim, but the res judicata effect extends only to matters adjudicated at the time of that decision and does not extend to future changes in the claimant's medical condition." *Houn*, at ¶ 12 (citing *Lass v.*

*North Dakota Workmen's Comp. Bur.,* 415 N.W.2d 796, 800–01 (N.D.1987)).

A

[¶ 15] WSI contends no "formal" motion is necessary to assert its continuing jurisdiction or initiate vocational rehabilitation services. Drayton argues, however, that WSI did not invoke its continuing jurisdiction under N.D.C.C. § 65–05–04 by bringing "its own motion" and, further, did not institute rehabilitation services by bringing "its own motion" under N.D.C.C. § 65–05.1–01. Drayton asserts that since a "formal" motion was not brought by WSI, she was not permitted to respond to any purported reopening of her claim or award of vocational rehabilitation. Drayton also asserts that WSI's failure to bring a formal motion means that WSI only conducted an investigation as to whether the claim should be reopened or as to the appropriateness of providing rehabilitation services. In essence, Drayton suggests that while WSI is permitted to investigate her condition under these statutes, WSI did not actually reopen her claim or award rehabilitation benefits under these statutes so as to permit the consequences of noncompliance.

[¶ 16] This Court, however, has not previously interpreted the statutes to require WSI to make a formal motion to itself, with a corresponding opportunity to respond and presumably a hearing, to either investigate or reopen a claim. The phrase "on its own motion" has been interpreted as having identical meaning as the expression "sua sponte." *See State v. Ham,* 45 Ohio St.2d 112, 341 N.E.2d 594, 596 (1976). "Sua sponte" is defined as " 'of one's own accord; voluntarily' " and "[w]ithout prompting or suggestion; on its own motion." *Black's Law Dictionary* 1464 (8th ed. 2004). In interpreting a court rule's use of the phrase "upon its

own motion" as relating to change of venue, the court held a trial court was authorized in its discretion to voluntarily order a change of venue "without consultation with counsel and without conducting a hearing." *Ham,* 341 N.E.2d at 596; *see also United States v. Seltzer,* 127 F.Supp.2d 172, 174 (E.D.N.Y.2000) (discussing *Ham,* supra). Under the plain language of these statutes, the phrase "on its own motion" portends that WSI may act voluntarily, sua sponte, or on its own accord, rather than by formal motion practice. We thus conclude no formal motion is necessary for WSI to act "on its own motion" for vocational rehabilitation services under either N.D.C.C. § 65–05–04 or N.D.C.C. § 65–05.1–01.

[¶ 17] Furthermore, although Drayton suggests due process requires a formal motion, we have previously discussed due process requirements for termination of benefits. *See, e.g., Rojas v. Workforce Safety & Ins.,* 2005 ND 147, ¶ 11, 703 N.W.2d 299; *Sjostrand v. North Dakota Workers Comp. Bur.,* 2002 ND 125, ¶¶ 9–10, 649 N.W.2d 537; *Stewart v. North Dakota Workers Comp. Bur.,* 1999 ND 174, ¶¶ 12–13, 599 N.W.2d 280; *Tooley v. Alm,* 515 N.W.2d 137, 142 (N.D.1994). In this case, however, Drayton was provided with pre-termination notice and an opportunity to respond, in addition to a full evidentiary hearing. *See Beckler v. North Dakota Workers Comp. Bur.,* 418 N.W.2d 770, 775 (N.D.1988) (holding claimant entitled to pretermination notice that benefits would be terminated, summary of evidence supporting termination, and opportunity to respond, but not requiring pretermination evidentiary hearing). We conclude Drayton was not denied due process when WSI initiated vocational rehabilitation services without a formal motion.

B

[¶ 18] Drayton asserts that her workday limitation and other medical restric-

tions are subject to administrative res judicata, barring WSI from exercising continuing jurisdiction and terminating her disability benefits for failure to comply with vocational rehabilitation services. In reversing WSI's order, the district court concluded administrative res judicata precluded termination of Drayton's disability benefits for noncompliance with rehabilitation services. Relying on WSI's 1997 order that determined Drayton's eligibility for disability benefits, the district court held "WSI could not require Drayton to undergo rehabilitation services as a condition precedent to receiving further disability benefits." The court held that "WSI must first determine if there is new evidence or a change in Drayton's medical condition before it can exercise continuing jurisdiction under N.D.C.C. § 65–05–04 and change Drayton's benefits." The court's decision, however, misstates our precedent on the application of administrative res judicata to WSI decisions. *See Houn,* 2005 ND 115, ¶ 12, 698 N.W.2d 271 ("an unappealed WSI decision is res judicata unless WSI reopens the claim, but the res judicata effect extends only to matters adjudicated at the time of that decision and does not extend to future changes in the claimant's medical condition").

[¶ 19] Generally, res judicata prohibits the relitigation of claims that were raised or could have been raised in a prior proceeding between the same parties or their privies and that were resolved by final judgment in a court of competent jurisdiction. *See Ungar v. North Dakota State Univ.,* 2006 ND 185, ¶ 11, 721 N.W.2d 16. "Administrative res judicata is the judicial doctrine of res judicata applied to an administrative proceeding." *Cridland v. North Dakota Workers Comp. Bur.,* 1997 ND 223, ¶ 18, 571 N.W.2d 351.

This Court is more circumspect about applying administrative res judicata than judicial res judicata, "taking into account (1) the subject matter decided by the administrative agency, (2) the purpose of the administrative action, and (3) the reasons for the later proceeding." *Id.* In *Cridland,* at ¶ 29, in which a formal "trial-type" hearing led to a WSI order deciding the claimant's continued entitlement to medical and disability benefits, we stated:

The plain language of N.D.C.C. § 65–05–04, authorizes the Bureau to review an award "at any time" and "in accordance with the facts found on such review" to "end, diminish, or increase the compensation previously awarded." That language, however, does not preclude application of the doctrine of administrative res judicata to Bureau decisions entered after a formal adjudicative hearing. Although the Bureau has some discretionary authority to review previous awards under N.D.C.C. § 65–05–04, that statutory authority does not mean the Bureau can relitigate issues that were or should have been decided in a prior formal adjudicative proceeding. We are not persuaded the Legislature intended to give the Bureau unlimited authority to relitigate issues that should have been raised in a prior formal adjudicative hearing. Rather, *Johnson [v. North Dakota Workers' Comp. Bur.,* 484 N.W.2d 292 (N.D.1992)] and N.D.C.C. §§ 65–05–04 and 65–05–29(3) must be considered in light of the doctrine of administrative res judicata, the importance of finality of agency decisions, and the purpose of the workers compensation law to provide injured workers with "sure and certain relief" to preclude the Bureau, in the absence of new evidence or a change in medical condition, from relitigating claims which were, or should

have been decided, in a prior formal adjudicative hearing.

(Footnote omitted.)

■ [¶ 20] As a part of its ongoing monitoring, WSI may initiate vocational rehabilitation services, including evaluation, if it believes it is beneficial. *See* N.D.C.C. § 65–05.1–01(8)(a) [N.D.C.C. § 65–05.1–01(7)(a) (1993) ] (WSI is permitted to initiate rehabilitation services "on its own motion" or sua sponte). In this case, the issue is not whether Drayton continues with her disability, but rather whether she was noncompliant with vocational rehabilitation services. WSI is not attempting to relitigate the fact that Drayton is disabled. WSI has not sought to adjust or terminate Drayton's benefits on the basis of a change in her medical condition or evidence that she is no longer disabled. Rather, the issue is Drayton's noncompliance with vocational rehabilitation services and the consequences of her actions under N.D.C.C. §§ 65–05–28 or 65–05.1–04.

[¶ 21] Here, with regard to the proper application of administrative res judicata, the record does not reflect that any formal "trial-type" hearing led to WSI's November 1997 order. Further, whether additional rehabilitation services would be beneficial almost 13 years after Drayton's injury could not have been contemplated by the November 1997 order. While it does appear that some rehabilitation services were previously attempted before or about the time of the 1997 order, those attempts do not preclude initiating vocational rehabilitation services now. *Cf. Fischer v. North Dakota Workers Comp. Bur.*, 530 N.W.2d 344, 347 (N.D.1995) (for res judicata purposes, an agency's final order corresponds with a court's final judgment, but the bureau's vocational assessment does not meet this description).

[¶ 22] We conclude administrative res judicata does not preclude WSI from either initiating vocational rehabilitation services or imposing consequences for noncompliance with those services under N.D.C.C. §§ 65–05–28 or 65–05.1–04.

## C

■ [¶ 23] WSI argues Drayton could be properly found in noncompliance with vocational rehabilitation under N.D.C.C. § 65–05.1–04 after initiating the functional capacity assessment. Drayton contends, however, that the provisions relating to noncompliance under N.D.C.C. § 65–05.1–04(6) apply only after a vocational rehabilitation "program" has begun.

[¶ 24] We disagree with Drayton's narrow interpretation of what constitutes initiating "vocational rehabilitation services," thus invoking the application of N.D.C.C. ch. 65–05.1. Under N.D.C.C. § 65–01–02(26), "[r]ehabilitation services" are defined as "nonmedical services reasonably necessary to restore a disabled employee to substantial gainful employment" and may include "vocational evaluation, counseling, education, workplace modification, and vocational retraining...." *See also* N.D.C.C. § 65–01–02(27) (1993). Under N.D.C.C. § 65–05.1–01(2), "comprehensive rehabilitation services" are further defined to include "medical, psychological, economic, and social rehabilitation." Additionally, as will be discussed further, N.D.C.C. § 65–05.1–04, which defines an injured worker's responsibilities for vocational rehabilitation services, specifically contemplates a claimant's testing and medical and vocational assessment in connection with those services.

[¶ 25] When WSI initiated vocational rehabilitation services under N.D.C.C. ch. 65–05.1 for Drayton, and initiated the functional capacity assessment in April 2006, Drayton's corresponding responsibilities under N.D.C.C. § 65–05.1–04 were impli-

cated. We reject Drayton's distinction that N.D.C.C. § 65–05.1–04(6) does not apply until a rehabilitation program or plan has actually been awarded and that the FCAs in this case were mere investigation as to whether to initiate services under N.D.C.C. ch. 65–05.1. We conclude that Drayton could be properly found in noncompliance with vocational rehabilitation under N.D.C.C. § 65–05.1–04.

## IV

[¶ 26] WSI argues, and the ALJ concluded, that the 2005 version of N.D.C.C. § 65–05.1–04, which was in effect on the date of Drayton's functional capacity assessment, governs the issues in this case. WSI also argues, however, that even under the 1993 version of the statutes, WSI could discontinue Drayton's disability benefits for noncompliance with vocational rehabilitation on the basis of Drayton's failure to give maximum consistent effort on her two FCAs.

[¶ 27] This Court has consistently held that "[u]nless otherwise provided, statutes in effect on the date of injury govern a claimant's right to collect workers compensation benefits." *Reopelle*, 2008 ND 98, ¶ 11, 748 N.W.2d 722; *see also Rodenbiker v. Workforce Safety & Ins.*, 2007 ND 169, ¶ 16, 740 N.W.2d 831; *Sjostrand*, 2002 ND 125, ¶ 14, 649 N.W.2d 537; *Wanstrom v. North Dakota Workers Comp. Bur.*, 2000 ND 17, ¶ 7, 604 N.W.2d 860; *Saari v. North Dakota Workers Comp. Bur.*, 1999 ND 144, ¶ 10, 598 N.W.2d 174; *Thompson v. North Dakota Workers' Comp. Bur.*, 490 N.W.2d 248, 251 (N.D.1992). In *Reopelle*, at ¶ 11, we explained:

> That rule is an outgrowth of the requirement that statutory provisions are not retroactive unless "expressly declared to be so." N.D.C.C. § 1–02–10; *White v. Altru Health Sys.*, 2008 ND 48, ¶ 20, 746 N.W.2d 173 (applying N.D.C.C. § 1–02–

10 and *Reiling v. Bhattacharyya*, 276 N.W.2d 237 (N.D.1979) and stating statutory directive is clear that "[i]f a statute is to be retroactive, the Legislature must expressly declare it to be so"). However, a statutory provision may not operate retroactively to abrogate a vested right or a valid obligation. N.D.C.C. § 1–02–30; *Tedford [v. Workforce Safety & Ins.]*, 2007 ND 142, ¶ 17, 738 N.W.2d 29; *Sjostrand*, at ¶ 14; *Saari*, at ¶ 10; *Gregory v. North Dakota Workers Comp. Bureau*, 1998 ND 94, ¶¶ 32–33, 578 N.W.2d 101. A vested right is an immediate or fixed right to present or future enjoyment that does not depend upon an event that is uncertain. *Sjostrand*, at ¶ 14; *Saari*, at ¶ 10; *Jensen v. North Dakota Workers Comp. Bureau*, 1997 ND 107, ¶ 11, 563 N.W.2d 112. A common thread connecting our cases about retroactive application of statutes and vested rights is that statutes may not be retroactively applied to discontinue or reduce benefits that a claimant had been receiving, or already had a vested right in receiving. *Saari*, at ¶ 17.

[¶ 28] At issue here is whether the vocational rehabilitation statutes in effect on the date of Drayton's injury govern her vocational rehabilitation, or whether the statutes in effect when the vocational rehabilitation determination is made govern her case. Some of our cases support the application of the statutes in effect when the vocational rehabilitation determination is made. *See Thompson*, 490 N.W.2d at 251 n. 4 (stating rehabilitation claims are made after a claimant has reached maximum medical recovery, and claimant had not demonstrated a vested right to rehabilitation under law effective at time of his injury because there was no immediate or fixed right to present or future enjoyment and which did not depend upon an event that was uncertain). *See also Sjostrand*, 2002 ND 125, ¶ 15, 649 N.W.2d 537 (hold-

ing a determination of whether a recipient remains disabled and entitled to benefits may be made any time and a determination of continuing disability should be based on the law when the determination is made, not that in effect at the time of injury); *Tangen v. North Dakota Workers Comp. Bur.*, 2000 ND 135, ¶¶ 15–16, 613 N.W.2d 490 (holding 1995 amendment to statute applied to claimant's reapplication for aggravation benefits, while date of original injury was 1992); *Snyder v. North Dakota Workers Comp. Bur.*, 2001 ND 38, ¶ 9, 622 N.W.2d 712 (applying subsequent amendments of N.D.C.C. § 65–05–08(3) requiring monthly reports despite not having been in effect on date of injury). In *Rodenbiker*, 2007 ND 169, ¶ 16, 740 N.W.2d 831 (applying law in effect in March 2000, despite functional capacity assessments in 2002 and 2003), this Court recently said the statute in effect on the date of the claimant's injury applied to vocational rehabilitation services. In *Rodenbiker*, this Court stated:

> Two statutes are central to this case: N.D.C.C. § 65–05.1–01 and N.D.C.C. § 65–05–10. The parties mistakenly agreed that the 2003 version of the statutes was the appropriate version to apply to Rodenbiker's claim. However, the applicable statutes are those effective on March 2000, the date Rodenbiker suffered her work-related injury.... Thus, the 1999 versions of N.D.C.C. § 65–05.1–01 and N.D.C.C. § 65–05–10 apply to this case. Although those statutory provisions were amended between 1999 and 2003, the amendments did not relate to eligibility for partial disability benefits and do not affect the outcome of this case.

*Rodenbiker*, at ¶ 16 (citing *Robertson v. North Dakota Workers Comp. Bur.*, 2000 ND 167, ¶ 21, 616 N.W.2d 844 and N.D.C.C. § 1–02–10).

[¶ 29] In this case, however, as in *Rodenbiker*, even if we agreed with Drayton's assertion that the 1993 version of the statutes apply, we conclude that WSI properly discontinued Drayton's benefits on the basis of WSI's findings of Drayton's willful noncompliance with vocational rehabilitation services.

[¶ 30] WSI asserts a reasoning mind could reasonably determine that Drayton intentionally manipulated the results of the functional capacity assessment and, therefore, engaged in a first instance of noncompliance without good cause. In reversing WSI's order, the district court concluded that WSI failed to properly analyze and explain the evidence. Here, the ALJ concluded that on the basis of the evidence, WSI properly terminated Drayton's benefits under N.D.C.C. §§ 65–05.1–04 and 65–05–28(4). Although the ALJ applied the 2005 version of the statutes, and WSI adopted the ALJ's decision as its final order, the ALJ made sufficient findings to sustain WSI's termination under either the 1993 or 2005 statutes.

[¶ 31] Specifically, N.D.C.C. § 65–05.1–04(6) (1993) provides, in part:

> *If, without good cause, the injured employee fails to attend a scheduled medical or vocational assessment,* or fails to attend a specific qualified rehabilitation program within ten days from the date the rehabilitation program commences, *the employee must be deemed to be in noncompliance with vocational rehabilitation.* ... If the employee establishes a pattern of noncooperation as heretofore described, involving two or more incidents of noncooperation, subsequent efforts by the employee to come into compliance with vocational rehabilitation may not be deemed successful compliance until the employee has successfully returned to the job or training program for a period of sixty days. *In all cases*

*of noncompliance by the employee, the bureau, by administrative order, shall discontinue lost-time benefits.* If, upon the bureau order becoming final, the period of noncompliance continues for sixty days, the bureau has no further jurisdiction in awarding any further temporary total, temporary partial, permanent total, or vocational rehabilitation benefits.

(Emphasis added.) *See also* N.D.C.C. § 65–05.1–04(3) (1993) ("The injured employee shall be available for testing under subsection 6 or 7 of section 65–05.1–02, and for any further examinations and testing as may be prescribed by the bureau to determine whether or not a program of rehabilitation is necessary."); N.D.C.C. § 65–05–28(4) (1993) (providing, in part: "If an employee ... refuses to submit to, or in any way intentionally obstructs, any examination, or refuses reasonably to participate in medical or other treatments, the employee's right to claim compensation under this title is suspended until the refusal or obstruction ceases."); *Zueger v. North Dakota Workers Comp. Bur.*, 1998 ND 175, ¶ 13, 584 N.W.2d 530 ("We have held that a claimant who attempts to manipulate an FCE by willfully failing to perform to the full extent of his or her abilities can be found to have intentionally obstructed the test, and benefits may be suspended under N.D.C.C. § 65–05–28(4).").

 [¶ 32] We have held that a willful failure to give a maximum consistent effort in a functional capacity assessment can constitute noncompliance with vocational rehabilitation under N.D.C.C. § 65–05.1–04(6). *See Thomas v. Workforce Safety & Ins.*, 2005 ND 52, ¶ 6, 692 N.W.2d 901; *see also Hoffman v. North Dakota Workers Comp. Bur.*, 2002 ND 138, ¶ 21, 651 N.W.2d 601 ("the word 'attend' in the statute clearly contemplates not only a mere physical presence, but also participation in

the medical or vocational assessment"). We reject Drayton's contention that under the 1993 version of N.D.C.C. § 65–05.1–04(6), WSI must prove a pattern of noncooperation. Under the statute's plain language, it is when the employee has established a pattern of noncooperation that additional conditions are imposed before the employee may be again considered successfully in compliance with vocational rehabilitation. WSI, on the other hand, is authorized to discontinue benefits *in all cases* of the employee's noncompliance. In *Hoffman*, at ¶¶ 14–15, this Court also explained:

[A] "claimant has good cause for failing to attend a rehabilitation program if the claimant has a reason that would cause a reasonably prudent person to refuse to attend the rehabilitation program under the same or similar circumstances." Whether a claimant has "good cause" under the statute is determined under an objective, reasonable person standard.... [T]he Bureau also has the burden of showing noncompliance with a rehabilitation plan. Once the Bureau establishes noncompliance, it becomes the claimant's burden to establish good cause for noncompliance.

(Citation omitted.)

 [¶ 33] Here, WSI found that relying on the evidence in the record, including testimony of the occupational therapists who performed the FCAs, and considering "the many inconsistencies and obvious failures to perform [on the FCAs] (e.g. refusing to walk more than 10 feet when she had just walked more than 100 is a particularly troubling result)," the greater weight of the evidence in this case showed Drayton "willfully failed to participate to her fullest capacity in the FCAs." WSI also found "the greater weight of the evidence shows that Ms. Drayton did not comply with the order to participate in

the [May 2006], FCA because she did not give a maximum consistent effort." Further, WSI concluded that Drayton had not demonstrated good cause to fail the FCA and that even if Drayton had argued that she had good cause, "when compared to her behaviors during the testing and on her breaks, the inconsistencies in her test results, do not support her claims that it was her pain that caused her to have inconsistent assessment results." From our examination of the record, we conclude a reasoning mind could reasonably find, as WSI did, that its finding of noncompliance was proven by the weight of the evidence on the entire record.

[¶ 34] Drayton contends that WSI disregarded medical evidence favorable to her, including Dr. Rokke's determination that she was still disabled and unlikely to improve. The findings of fact must "sufficiently address the evidence presented to the agency by the appellant." N.D.C.C. § 28–32–46(7). In its findings, however, WSI addresses Dr. Rokke's opinion:

> 25. Dr. Rokke wrote a letter on Ms. Drayton's behalf stating that the "results of the Functional Capacity Evaluations performed in June and July [had] not changed" his opinion that Ms. Drayton's work limitations were as set forth in his January 10, 2006, letter to WSI. His letter goes on to describe Ms. Drayton's statements to him about the second FCA, but does not address any specifics of the first FCA. Moreover his letter does not address if he thinks the results of the FCA were inaccurate or whether they did or did not represent an intentional manipulation of the FCA.

[¶ 35] Here, WSI considered the evidence in the record, including the testimony of occupational therapists Nelson and Nechiporenko that the invalid test results indicated a manipulated effort, and Drayton's testimony regarding her own explanations for her performance on the FCAs and that she did not intentionally manipulate the FCAs. WSI also explained its reasons for disregarding Dr. Rokke's opinion, who, while maintaining that Drayton remained disabled, did not address the results or intentional manipulation on the first FCA. WSI weighs the credibility of witnesses and resolves conflicts in the evidence, and we do not make independent findings of fact or substitute our judgment for that of the agency. WSI sufficiently addressed the medical evidence favorable to Drayton and we conclude a reasoning mind could reasonably find Drayton's noncompliance was proven by the weight of the evidence on the entire record.

[¶ 36] We therefore conclude WSI properly discontinued Drayton's benefits under N.D.C.C. §§ 65–05.1–04 and 65–05–28(4).

V

[¶ 37] WSI argues the district court erred in awarding Drayton attorney's fees under N.D.C.C. § 28–32–50, because the court erred in concluding WSI had acted without substantial justification.

[¶ 38] Section 28–32–50(1), N.D.C.C., requires a court to award reasonable attorney's fees and costs to a prevailing claimant when an administrative agency has acted without substantial justification. That statute requires a claimant to not only prevail, but also to prove the agency acted without substantial justification. *Rojas v. Workforce Safety & Ins.*, 2006 ND 221, ¶ 14, 723 N.W.2d 403. We have held that statute applies to WSI, but only in "rare cases" if WSI denies or reduces an employee's benefits without substantial justification. *Id.* at ¶¶ 16–17. "Substantial justification means, justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable

person." *Rojas*, at ¶ 17 (internal quotation omitted).

 [¶ 39] We review a district court's decision whether an agency acted with substantial justification for an abuse of discretion. *Tedford v. Workforce Safety & Ins.*, 2007 ND 142, ¶ 26, 738 N.W.2d 29. In this case, because we have reversed the district court's judgment and determined WSI properly terminated Drayton's benefits, we also conclude the court abused its discretion in finding WSI acted without substantial justification. We reverse the district court's award of attorney's fees.

 [¶ 40] Drayton nevertheless argues an award of attorney's fees is authorized under the 1993 version of N.D.C.C. § 65-10-03, which permitted broader awards of attorney's fees. WSI, however, contends this Court should decline to consider this issue because it is not ripe for determination. WSI asserts Drayton is entitled to an administrative hearing under N.D.C.C. § 65-02-08 on any denial or dispute concerning payment of attorney's fees, from which an appeal then could be pursued.

[¶ 41] Currently, N.D.C.C. § 65-10-03 requires WSI to pay attorney's fees only to an injured employee who prevails on appeal:

> The organization shall pay the cost of the judicial appeal and the attorney's fee for an injured employee's attorney when the employee prevails. The employee has prevailed when any part of the decision of the organization is reversed and the employee receives an additional benefit as a result. An injured employee does not prevail on a remand for further action or proceedings unless the injured employee ultimately receives an additional benefit. . . .

Section 65-10-03 (1993), N.D.C.C., while similar, provided in part:

> The cost of the judicial appeal and an attorney's fee for the claimant's attorney must be borne by the bureau when the claimant prevails. The claimant is deemed to have prevailed when any part of the decision of the bureau is reversed or the claim is remanded to the bureau for further administrative proceedings. *In an appeal by the bureau to the North Dakota supreme court, the claimant shall recover costs and attorneys' fees incurred in responding to the appeal.* . . .

(Emphasis added.) In 1995, the Legislature deleted the language authorizing the claimant to recover costs and attorney's fees in responding to an appeal to this Court by the bureau, now WSI. 1995 N.D. Sess. Laws, ch. 614, § 5. The Legislature further expressly declared the effective date, "This Act applies to any request for arbitration, hearing, or appeal taken from an administrative order issued after August 1, 1995." 1995 N.D. Sess. Laws, ch. 614, § 7.

[¶ 42] Drayton asserts the date of her work-related injury should control her statutory right under N.D.C.C. § 65-10-03 to receive attorney's fees and costs when WSI appeals to this Court. Drayton argues that her rights under this statute involve substantive rights, a vested right to the services of an attorney, and that subsequent amendments cannot therefore be applied to her claim retroactively.

 [¶ 43] As we have explained, although a statutory provision may not operate retroactively to abrogate a vested right or valid obligation, a vested right is one which is immediate or fixed to present or future enjoyment and does not depend upon an event that is uncertain. *See Reopelle*, 2008 ND 98, ¶ 11, 748 N.W.2d 722. Here, however, the claimant's right under the 1993 statute to attorney's fees in a subsequent appeal is contingent upon a

number of future events occurring. As such, Drayton's claim to attorney's fees under these circumstances cannot be said to have vested at her injury date because her fees claim largely depends on uncertain future events, i.e., the need to respond when WSI has appealed an adverse decision to this Court. Moreover, the Legislature specifically provided that the act applied to "any appeal taken from an administrative order after August 1, 1995."

[¶ 44] We also reject Drayton's claim that the "effective date" language does not apply here because Drayton is appealing from a district court judgment rather than an "administrative order." Drayton's argument ignores that this proceeding is a further appeal from a WSI administrative order, and this Court reviews that order rather than the district court's decision. *See* N.D.C.C. § 28–32–49; *Genter v. Workforce Safety & Ins. Fund,* 2006 ND 237, ¶ 12, 724 N.W.2d 132. We therefore reject Drayton's contention that the 1993 version of the statute applies to her request for attorney's fees for this appeal.

[¶ 45] Because Drayton has not ultimately prevailed on appeal, we conclude Drayton is not entitled to attorney's fees under N.D.C.C. § 65–10–03.

## VI

[¶ 46] We have considered Drayton's remaining arguments and find them without merit. We reverse the district court judgment and reinstate WSI's final order discontinuing Drayton's temporary disability benefits.

[¶ 47] GERALD W. VANDE WALLE, C.J., RONALD E. GOODMAN, S.J., CAROL RONNING KAPSNER, and MARY MUEHLEN MARING, JJ., concur.

[¶ 48] The Honorable RONALD E. GOODMAN, S.J., sitting in place of CROTHERS, J., disqualified.